985 A.2d 886

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Christopher SMITH, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 2008.

Decided Dec. 29, 2009.

128

130

Gary Sanford Server, Server & Lowe, P.C., Philadelphia, David Rudenstein, for Christopher Smith.

Amy Zapp, Harrisburg, Hugh J. Burns, Jr., Philadelphia District Attorney's Office, Philadelphia, Susan Wilcox, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

*OPINION*

Justice TODD.

Christopher Smith, also known as Darryl Myers, appeals the sentence of death imposed on July 16, 2005 by the Philadelphia Court of Common Pleas after a jury convicted him of first-degree murder,[1] possession of an instrument of crime,[2] reckless endangerment of another person,[3] and criminal conspiracy.[4] For the reasons that follow, we affirm his convictions and judgment of sentence.

The evidence of record establishes the following facts. On November 29, 2002, two rival gangs engaged in a gunfight at the North American Motor Inn on City Line and Belmont Avenue in Philadelphia. Appellant, who was known to some by the nickname "Jughead," was a member of one of the gangs, and, during the gunfight, two of his fellow gang members, Michael Allen Finney and Antoine Steed, were killed. Afterward, Appellant's gang decided to avenge the deaths of Finney and Steed; Appellant and several other gang members, including Aquil Bond (hereinafter "Bond" or "co-defendant"), Jawayne Brown, Richard Brown (Aquil Bond's cousin), Vincent Smithwick, and two others named Damar and Lonnie, gathered at the home of Richard Brown's girlfriend, Tammy, to formulate a plan. N.T. Trial, 5/4/05, at 93. The group decided that two members of the rival group, "Brent" and "G Bucks," whom they believed were responsible for shooting Finney and Steed, must be killed. *Id.* at 94. Richard Brown, the reputed leader of Appellant's gang, gave orders that any member of the rival gang should be shot on sight. *Id.* at 92.

A day or two later, shortly after midnight on December 1, 2002, Richard Carter was sitting with a female friend on the

1. 18 Pa.C.S.A. § 2502.
2. 18 Pa.C.S.A. § 907.
3. 18 Pa.C.S.A. § 2705.
4. 18 Pa.C.S.A. § 903.

steps of 4220 Ogden Street. N.T. Trial, 5/5/05, at 10. Several other men from the neighborhood were standing outside on the street, including someone whom Carter knew as "Buck," Brent Jenkins, and Jared Barkley. *Id.* at 12–13. At one point, Carter noticed a burgundy Park Avenue car circling the corner. *Id.* at 15. Jenkins was outside as the car circled the corner the first time, but left the area by the time it circled a second time. *Id.* at 16. As the car circled the corner for the second time, Carter saw the driver's side window open, and saw Bond, whom Carter recognized from the area, exit the car with a gun in his hand. *Id.* at 18–19. Bond approached an unidentified male who resembled Jenkins; however, apparently realizing that the man was not Jenkins, Bond returned to the car. *Id.* at 18. The car circled the corner a third time, and then stopped in front of 4210 Ogden Street, at which time Appellant and Bond jumped out of the car and began firing shots down Ogden Street. *Id.* at 19. Moments before the shooting began, Carter observed Rasheed Abdul Grant, also known as Abdul Brooks, or "Rev," *id.* at 14, standing near the passenger side of his maroon Pontiac Bonneville, which was parked in front of Grant's father's house at 4219 Ogden Street. *Id.* at 21–22. When the shooting began, Carter ran. *Id.* at 19.

At approximately 1:40 a.m., Philadelphia Police Officer Joseph Rogers received a radio call indicating gunshots in the area of 42nd and Ogden Streets and the 800 block of Brooklyn Street. N.T. Trial, 5/4/05, at 179. When Officer Rogers arrived at the scene, he observed Grant lying face down in the street with his eyes open and not breathing. *Id.* at 179, 181. Rogers radioed for a rescue squad, which arrived approximately ten minutes later. *Id.* at 180–81. Grant was pronounced dead at the scene at 1:53 a.m., having suffered seven gunshot wounds to his body. *Id.* at 31–32. Another man, Antwoin Weston, had been shot in the leg and was crawling along the sidewalk. *Id.* at 185, 187. He was transported to the hospital for treatment. *Id.* at 187.

At approximately 2:10 a.m., William Whitehouse of the Philadelphia Police Crime Scene Unit arrived at 42nd and

Ogden Streets to process the crime scene and observed the following vehicles: (1) a maroon Crown Victoria with two holes in the windshield parked in front of 4210 Ogden Street; (2) a maroon Pontiac Bonneville in front of 4219 Ogden Street, next to which Grant's body was found; and (3) a red Jeep with some damage in front of 4221 Ogden Street. Whitehouse recovered 30 spent gun cartridges from three separate areas of the scene, including the area in front of 4205 and 4207 Ogden Street; the sidewalk in front of 4217 and 4219 Ogden Street; and the street in front of 4217 and 4219 Ogden Street. All of the cartridges were .357 caliber, and it was determined that 19 were fired from a single weapon, and 11 were fired from a second weapon.

Nearly four months after the Ogden Street shooting, on April 13, 2003, Officer Jerrell Short of the 9th Police District was working nightclub detail at 6th and Spring Garden Streets in Philadelphia. At approximately 3:30 a.m., Officer Short observed Appellant and Richard Brown running towards him. *Id.* at 191–193. Officer Short stopped them and ordered them to stand against a gate and show their hands. *Id.* at 194. Appellant appeared to be fumbling around the midsection of his pants or jacket. *Id.* Ultimately, Appellant and Brown ran away, and Officer Short and several other officers, including Officer Short's partner, Officer Gregory Welsh, pursued them on foot. *Id.* at 195, 202. As they did so, Officer Welsh observed Appellant remove a black gun from his waistband and throw it into the street. *Id.* at 202. Officer Welsh retrieved the gun, a Sig Pro 2340 .357 caliber black semi-automatic handgun, serial number SP0061985. *Id.* at 205. He removed the magazine from the gun, as well as one live round from the chamber. *Id.* Police also collected seven spent cartridges from the area, and ballistics analysis established that five of them came from the gun thrown into the street by Appellant.[5] Appellant was captured by police and arrested.

5. Apparently, just prior to being apprehended, Appellant had shot another individual whose identity is not relevant to the instant case. The shooting was not mentioned at Appellant's trial in the instant case, and the spent cartridges that were retrieved by Officer Welsh were referred to only as "ballistics evidence" so the jury would not know that

On May 14, 2003, Agent Anthony Tropea of the federal Bureau of Alcohol, Tobacco and Firearms questioned Appellant's girlfriend, Juanita Stokes–Steadley, regarding her purchase of a Sig Pro .357 caliber semi-automatic pistol from the Firing Line Gun Store on November 29, 2002, following the gunfight at the North American Motor Inn. *Id.* at 56. When first questioned, Stokes–Steadley maintained that she purchased the firearm for her own use, with her own money. *Id.* Agent Tropea asked Stokes–Steadley to produce the firearm, and she indicated that the gun was in the basement of her residence. *Id.* When agents went to retrieve the firearm, they found an empty gun box bearing the serial number SP0061985, the serial number of the gun Stokes–Steadley admitted to having purchased. *Id.* at 57. Upon further questioning, Stokes–Steadley admitted to Agent Tropea that Appellant gave her the money for the firearm and gave her specific instructions to purchase the Sig Pro .357 caliber pistol and ammunition. *Id.* At trial, Stokes–Steadley testified that Appellant first asked her to purchase the gun two days before November 29, 2002;[6] that Appellant gave her the money to purchase the gun and ammunition on November 29, 2002; and that after she purchased the gun and ammunition on November 29, 2002, she gave it to Appellant, and that was the last time she saw the gun. *Id.* at 57–58; N.T. Trial, 5/2/05, at 36; N.T. Trial, 5/3/05, at 59, 69, 89. It later was determined that 19 of the spent cartridges recovered from the scene of the Ogden Street murder came from this gun.

In September 2003, one of Appellant's fellow gang members, Vincent Smithwick, nicknamed "Scooter," was arrested

Appellant had committed another crime. During the penalty phase hearing, however, the jury did learn that Appellant was convicted of aggravated assault for shooting a man prior to being chased and apprehended by police on April 13, 2003.

**6.** The prosecutor seemed to doubt the accuracy of Stokes–Steadley's testimony regarding the date on which Appellant first asked her to purchase a weapon, as evidenced by his cross-examination. *See* N.T. Trial, 5/3/05, at 88–89. Nevertheless, Stokes–Steadley maintained that Appellant asked her to purchase the gun two days before the date she actually purchased the gun, *id.*, which, if true, would suggest that Appellant wanted to obtain the gun prior to the shooting at the North American Motor Inn.

on federal drug charges. As part of a plea agreement, Smithwick gave a statement to police concerning seven different homicides, implicating himself in two of the murders. Smithwick also provided information regarding the murder of Grant. At trial in the instant case, Smithwick testified that the members of Richard Brown's gang decided to retaliate against their rivals for the November 29, 2002 shooting at the North American Motor Inn. N.T. Trial, 5/4/05, at 92. Smithwick described how, on November 30, 2002, he, Bond, and Jawana Moore, who was Smithwick's half-sister and Bond's girlfriend, went to the Firing Line Gun Store to purchase a .357 caliber Sig Pro firearm. *Id.* at 95. Smithwick testified that Bond wanted to purchase that particular model because "Richard Brown had one first and liked the model." *Id.* He also testified that only he and Moore went inside the store, and that Moore actually purchased the gun. *Id.* The serial number of the gun purchased by Moore was SP0061983. N.T. Trial, 5/3/05, at 168.

Smithwick further testified that he was at the home of Richard Brown's girlfriend, Tammy, on December 1, 2002, when Bond and Appellant stated that they were going to 42nd and Ogden Streets to kill whomever they saw "that was hanging with Brent and Malik [and] G Bucks." N.T. Trial, 5/4/05, at 97. Smithwick recounted that, after Appellant and Bond returned to the house, Appellant bragged that he had shot one man in the leg, and Bond stated that "he needed more bullets" and that both he and Appellant had shot someone in the face. *Id.* at 98. The following morning, Smithwick learned that someone named Rev, i.e., Grant, had been shot and killed. Smithwick indicated that he spoke with Bond about Rev being killed, and Bond stated, "That wasn't the right person, man." *Id.* at 99.

Finally, Smithwick testified that a couple of days after Grant was killed, he and Bond were at the home of Chante Baker, another of Bond's girlfriends, at 54th and Girard Streets, when police arrived to arrest Bond on another matter. Smithwick stated that, after Bond and Baker left the house, he returned to the house because he had some drugs inside and

wanted to retrieve them. *Id.* at 107. In addition to removing the drugs from the house, Smithwick also admitted to removing a .357 caliber Sig Pro firearm, the same gun that Jawana Moore purchased for Bond on November 30, 2002, which Smithwick knew Bond kept under Baker's mattress. *Id.*

Baker also testified at trial. She recounted that, in late November 2002, Bond asked her to purchase a gun for him, but she was unable to do so because she had a prior felony conviction. N.T. Trial, 5/5/05, at 139. She indicated that Bond subsequently advised her that he had another individual, Moore, purchase a gun for him. *Id.* She testified that she eventually saw the gun, and that Bond kept it underneath her mattress when he stayed at her house. *Id.* at 140. She indicated that she was at home with Bond when police arrived to arrest him on December 10, 2002, and that she was arrested at that time for attempting to stop the officers from entering the house. *Id.* at 141. Baker testified that she subsequently asked Smithwick what had happened to the gun that had been under her mattress, and he advised her that he removed it. *Id.*

On December 10, 2002, police executed a search warrant of the apartment of Richard Brown, also known as Richard Bond or "Mannie–Boo," at 4000 Presidential Boulevard, Apartment 2006. *Id.* at 118. The police recovered from the apartment two .357 caliber Sig Pro semi-automatic weapons, including one with the serial number SP0061983, which was the serial number of the gun purchased by Moore from the Firing Line Gun Store on November 30, 2002. Ballistics analysis established that 11 of the spent cartridges recovered from the scene of the Ogden Street shooting came from the gun purchased by Moore. While the bullets lodged in Grant's body were too damaged to be positively matched to either Appellant's or Bond's weapon, the bullets were the same type of ammunition as used in their weapons.

Appellant and Aquil Bond were jointly tried before the Honorable Sheila Woods–Skipper. On May 6, 2005, a jury convicted Appellant of the aforementioned charges; it acquit-

ted him of attempted murder with regard to Antwoin Weston.[7] At the penalty phase, the jury found three aggravating factors [8] and no mitigating factors, and recommended a sentence of death. Appellant was formally sentenced to death on July 26, 2005. This appeal followed.

## I. Sufficiency of the Evidence

Although it is this Court's practice to review the sufficiency of the evidence for first-degree murder in all death penalty direct appeals regardless of whether the appellant raises such a challenge, *see Commonwealth v. DeJesus,* 580 Pa. 303, 308, 860 A.2d 102, 105 (2004), we note that, in the instant case, Appellant does, in fact, claim that his convictions were not supported by sufficient evidence.[9] In reviewing the sufficiency of the evidence, this Court must determine whether the evidence admitted at trial, and all the reasonable inferences derived therefrom viewed in favor of the Commonwealth as the verdict winner, supports the jury's finding of all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Montalvo,* 598 Pa. 263, 274, 956 A.2d 926, 932 (2008), *cert. denied* — U.S. ——, 129 S.Ct. 1989, 173 L.Ed.2d 1091 (2009).

Evidence is sufficient to sustain a conviction for first-degree murder when the Commonwealth establishes that: (1)

7. Aquil Bond was convicted of the same charges as Appellant, and likewise was sentenced to the death penalty. Bond's appeal is presently before this Court at No. 501 CAP.

8. The aggravating factors found by the jury were: Appellant was serving a life sentence following his conviction in a federal conspiracy case, 42 Pa.C.S.A. § 9711(d)(10); Appellant had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S.A. § 9711(d)(9); and Appellant, in the commission of the offense, knowingly created a grave risk of death to another person in addition to the victim, 42 Pa.C.S.A. § 9711(d)(7).

9. Although Appellant intimates in his Statement of Issues that he is challenging the sufficiency of the evidence to support all of his convictions, and indeed the trial court addresses the evidence in support of Appellant's other convictions, as the Commonwealth points out, Appellant offers no argument in his brief regarding convictions other than his convictions of first-degree murder and criminal conspiracy. Accordingly, we confine our review to whether the evidence was sufficient to support Appellant's convictions for these two crimes.

a human being was unlawfully killed; (2) the accused is responsible for the killing; and (3) the accused acted with specific intent. 18 Pa.C.S.A. § 2502(a); *Montalvo*, 598 Pa. at 274, 956 A.2d at 932. An intentional killing is a "[k]illing by means of poison, or by lying in wait, or any other kind of willful, deliberate, and premeditated killing." 18 Pa.C.S.A. § 2502(d); *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998). The Commonwealth may establish that the defendant intentionally killed the victim through wholly circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Montalvo*, 598 Pa. at 274, 956 A.2d at 932.

■■ In order to convict a defendant of conspiracy, the trier of fact must find that: "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another ... to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Id.* (ellipsis original and internal quotation marks omitted). Each member of a conspiracy to commit homicide can be convicted of first-degree murder, regardless of who inflicted the fatal wound. *Id.* at 274–75, 956 A.2d at 932.

Appellant argues that he is entitled to an arrest of judgment because the Commonwealth failed to prove, beyond a reasonable doubt, that he committed first-degree murder, either as a principal, conspirator, or accomplice. In support of his argument, Appellant asserts that Smithwick's testimony only established Appellant shot someone in the leg, and that there was no evidence that Appellant shot anyone in the face or that Appellant confessed to shooting anyone in the face. Appellant further notes that, although Carter testified that Appellant was at the scene, Carter did not state that Appellant had a weapon in his hand.[10] Appellant's Brief at 15. He further

10. The Commonwealth disputes any suggestion by Appellant that Carter testified Appellant did not have a gun in his hand. Rather, the Commonwealth argues Carter merely testified he could not remember whether he saw Appellant with a gun. Commonwealth's Brief at 17.

contends that the fact that one of the guns used at the scene of the Ogden Street murder was the same gun police observed Appellant attempt to discard at 6th and Spring Garden Streets does not "tie" him to Grant's murder, as the testimony at trial established that weapons often are transferred from person to person. *Id.* at 16. Finally, he argues that he cannot be convicted of first-degree murder as an accomplice because there is no evidence he aided or abetted Bond, and Appellant's and Bond's joint presence at the scene "was not in any way assisting or helping or encouraging the co-defendant Bond to engage in his murderous conduct." *Id.* at 18.

With regard to his conspiracy conviction, Appellant maintains that, although he may have been present when Richard Brown demanded retribution for the shooting of Finney and Steed, there was no evidence that Appellant agreed to share in the criminal conspiracy to seek retribution on the rival gang members. *Id.* at 16. He posits that while his "presence at the scene of the crime is interesting, it still does not prove that he had joined the Conspiracy." *Id.* at 17.

Addressing Appellant's conspiracy conviction first, we conclude the evidence was sufficient to sustain his conviction. As noted above, Smithwick testified at trial that, following the murder of Finney and Steed on November 29, 2002, members of Richard Brown's gang, including Appellant and Bond, gathered at the home of Richard Brown's girlfriend, Tammy, and discussed their plan for retaliation. N.T. Trial, 5/4/05, at 93. Smithwick testified that, on the following day, November 30, 2002, he, Bond, and Moore went to the Firing Line Gun Store, where Moore purchased a firearm at the direction of Bond. *Id.* at 95. Smithwick further described how, on December 1, 2002, he again was at the home of Brown's girlfriend, Tammy, when Bond and Appellant announced they were going to 42nd and Ogden Streets to kill whoever they saw "that was hanging with Brent and Malik [and] G Bucks." *Id.* at 97. In addition, Carter testified that he observed Appellant and Bond circle the corner of 42nd and Ogden Streets in a burgundy Park Avenue twice before Bond exited the vehicle and approached a man who resembled Brent Jenkins. Upon realizing that the

man was not Jenkins, Bond returned to the car. Carter then saw the car circle the corner a third time, after which both Appellant and Bond exited the vehicle and the shooting began. This evidence established more than Appellant's mere presence at the scene of the crime; it established that Appellant, over several days, engaged in a deliberate, pre-meditated plan to exact revenge on individuals believed responsible for the shootings of Finney and Steed. Thus, we find the evidence was sufficient to support Appellant's conviction for conspiracy.

■ Similarly, we hold the evidence was sufficient to support Appellant's conviction for first-degree murder. As the trial court noted, the assistant medical examiner testified that Grant suffered seven separate gunshot wounds to his body, including wounds to his left and right lungs, his spleen, his liver, his left shoulder, his arms, and his head. *See* Trial Court Opinion, 11/15/07, at 29; N.T. Trial, 5/4/05, at 32–34. This evidence clearly was sufficient to enable the jury to conclude that Grant was intentionally killed. *See Montalvo*, 598 Pa. at 274, 956 A.2d at 932 (use of a deadly weapon on a vital part of the victim's body sufficient to establish an intentional killing).

■ Moreover, Carter testified that he observed Appellant and Bond exit their vehicle moments before the shooting began. Ballistics evidence established that the 30 spent cartridges from the Ogden Street area where Grant was gunned down were .357 caliber Sig Remington brand ammunition. N.T. Trial, 5/4/05, at 232. Nineteen of the recovered cartridges were attributable to the specific gun identified by serial number SP0061985, which was the gun purchased for and given to Appellant by Stokes–Steadley, and which Appellant attempted to discard when stopped by police at 6th and Spring Garden Streets on April 13, 2003. The remaining 11 cartridges were determined to have been fired from the gun identified by serial number SP0061983, the gun purchased by Moore at Bond's request and recovered from the home of Richard Brown. Although the bullet fragments recovered from Grant's body could not positively be matched to either

firearm, analysis revealed that they were .357 caliber with a similar configuration to the spent cartridges recovered from Ogden Street. Even assuming, as Appellant urges us to do, that the fatal bullet was fired by Bond and not Appellant, the evidence was sufficient to convict Appellant of first-degree murder as a co-conspirator. *See Montalvo,* 598 Pa. at 274–75, 956 A.2d at 932 (each member of a conspiracy to commit homicide can be convicted of first-degree murder, regardless of who inflicted the fatal wound); *Commonwealth v. Boxley,* 575 Pa. 611, 618, 838 A.2d 608, 612 (2003) (evidence was sufficient to support appellant's conviction for first-degree murder, regardless of whether appellant or one of his co-conspirators fired the fatal shot).[11]

## II. Weight of the Evidence

As an alternative to his argument that the evidence was insufficient to support his convictions, Appellant contends that he is entitled to a new guilt phase trial on all of his convictions because his convictions were against the weight of the evidence. As with his sufficiency arguments, Appellant only addresses his convictions for first-degree murder and criminal conspiracy, and our review is therefore limited to Appellant's convictions for these two crimes. As we explained in *Commonwealth v. Diggs,* 597 Pa. 28, 949 A.2d 873 (2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1580, 173 L.Ed.2d 678 (2009),

[a] motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the wit-

11. In its 1925(a) opinion, the trial court concludes Appellant properly was convicted of first-degree murder under the theory of accomplice liability. *See* Trial Court Opinion, 11/15/07, at 30. As we conclude that the evidence supports Appellant's conviction for first-degree murder as a co-conspirator, we need not address Appellant's argument, or the trial court's reasoning, in this regard.

nesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Id.* at 39, 949 A.2d at 879.

Appellant acknowledges that the Commonwealth's case is supported by: (1) the fact that Appellant was present when Richard Brown called for revenge; (2) Appellant was present when the victim was shot and killed; and (3) Appellant previously possessed a weapon that was used at the crime scene.[12] Appellant's Brief at 20. However, he asserts that the following evidence does not support the verdict:

1. [M]any people were at the meeting where Richard Brown called for revenge and from the Commonwealth's own evidence and theory of the case, not all of those people were conspirators.

2. [T]he Commonwealth has not presented evidence that [Appellant] intended to join the conspiracy nor shared the intent to kill.

3. [T]he weapon that [Appellant] possessed at 6th and Spring Garden Streets, while present at the scene of this incident, has never been placed into the hands of [Appellant] at the scene of the crime.

4. [T]he Commonwealth's only eyewitness, Richard Carter, testified that Aquil Bond was shooting but did not testify that [Appellant] was shooting.

5. [T]he Commonwealth's snitch or cooperating witness, Vincent Smithwick[,] only testified that [Appellant] claimed that he shot someone in the leg, although that would be wholly inconsistent with not having a gun as testified to by Mr. Carter.

12. The previous possession to which Appellant concedes is his receipt of the gun from Stokes–Steadley after she purchased it on November 29, 2002. *See* Appellant's Brief at 6.

6. [T]he Commonwealth's verdict is based on speculation, conjecture and surmise.

Appellant's Brief at 20–21.

Appellant admits that the Commonwealth's evidence, if believed, establishes that he had "an interest in what was occurring" at the scene of the crime; he alleges, however, that the Commonwealth failed to take that interest and prove that he "had a criminal intent to act on a mere interest." *Id.* at 21. Appellant further contends:

> on a claim that the verdict is against the weight of the evidence, the verdict winner, to wit, the Commonwealth, is not entitled to every inference and the Court can evaluate the evidence anew. This is especially important here where the testimony of the cooperating witness would be totally contradictory to the testimony of the Commonwealth's eyewitness and where the cooperating witness received a sweetheart deal of all time from both the Federal and State Authorities, the undersigned would urge this Court in its evaluation of the evidence to credit the testimony of Richard Carter who states that [Appellant] was not observed with a gun.

*Id.*

Initially, we note that Appellant wholly misstates this Court's standard of review. As previously discussed, in reviewing a challenge to the weight of the evidence, this Court reviews the trial court's exercise of discretion, *not* the underlying question of whether the verdict is against the weight of the evidence. *See Diggs,* 597 Pa. at 39, 949 A.2d at 879. In rejecting Appellant's challenge to the weight of the evidence, the trial court stated:

> The testimony indicated that appellant and Bond went looking for members of the rival gang to shoot in retaliation for the deaths of their members, Finney and Steed. The ballistics evidence recovered at the crime scene was matched to the firearm purchased for appellant by Stokes–Steadley and the firearm purchased for the co-defendant, Bond, by Moore. The firearm confiscated from appellant

matched sixteen [fired cartridge cases] recovered from 42nd and Ogden Streets, and the bullet removed from the decedent was consistent with the bullets identified as having been fired from those two weapons. Additionally, Carter, an eye witness to the shooting, identified appellant as the male who exited the car with Bond when the shooting began. The verdicts were consistent with the evidence presented at trial and there is no basis on which to conclude that the verdicts were so contrary to the evidence that they shock the [conscience].

Trial Court Opinion, 11/15/07, at 33.

We find no abuse of discretion by the trial court in rejecting Appellant's weight of the evidence claim. To the extent Appellant specifically argues that the evidence is contrary to Carter's statement "that [Appellant] was not observed with a gun," Appellant's Brief at 21, we note again that the Commonwealth disputes Appellant's characterization of Carter's testimony. *See supra* note 10. Indeed, the trial transcript indicates that Carter was asked by the prosecutor "Do you remember if Mr. Smith had anything in his hand" when he jumped out of the car with Bond, to which Carter responded "No." N.T. 5/5/05, at 24. Moreover, regardless of Carter's testimony, as the trial court determined, there was other evidence, including Smithwick's testimony in support of a conspiracy; ballistics evidence from the scene which matched the firearm purchased for Appellant by Stokes–Steadley and later found in Appellant's possession; and Carter's testimony that Appellant was present in and exited the car with Bond immediately before the shooting began, which supported the jury's verdict. Thus, we hold that Appellant is not entitled to relief on his weight of the evidence claim.

### III. Voluntary Manslaughter Charge

Appellant next argues that this Court should award him a new guilt phase trial because the trial court erroneously denied his request to have the jury charged on the crime of voluntary manslaughter. At trial, the defense argued that Appellant and his accomplices "had acted under heat of pas-

sion as the result of their friends being murdered in cold blood at the North American Motor Inn and further because Richard Brown had appealed to their emotions [inciting] them to take action." Appellant's Brief at 22. In its opinion written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court explained that it denied Appellant's jury charge request because "[t]he evidence at trial established an intentional killing where appellant discussed the murder of Finney and Steed, then left the house intending to shoot anyone believed to be connected with the rival gang. There was no evidence that appellant killed the victim in a sudden and intense passion." Trial Court Opinion, 11/15/07, at 17.

Appellant complains, however, that he "had requested a jury trial as he wanted a jury of 12 to decide each and every issue involved in the case," and suggests that "a rational finder of fact ... could well have concluded that the Defendants acted from heat of passion as the result of the Murder of their friends." Appellant's Brief at 22. He asserts that the trial court, by refusing to charge the jury on voluntary manslaughter, improperly "substituted its own judgment for that of the jury." *Id.* Appellant further posits:

[i]f the Murder of the Defendants' friends at the Motor Inn had occurred just moments or minutes prior to the Defendants' opening fire with their own weapons, it would seem clear that a charge on Voluntary Manslaughter should have been given. Simply because there was some passage of time between the Motor Inn incident and the shooting deaths in this case, it should not negate the necessity of having given the Manslaughter charge upon request as the passage of time was [ ] but a factor for a jury to consider as to whether the passion had cooled.

*Id.* at 24–25. Appellant's arguments are without merit.

Under Pennsylvania's Crimes Code,

A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the

killing he is acting under a sudden and intense passion resulting from serious provocation by:

 (1) the individual killed; or

 (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

18 Pa.C.S.A. § 2503(a).

In *Commonwealth v. Browdie*, 543 Pa. 337, 671 A.2d 668 (1996), this Court held

a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict. Therefore, only where an instruction is requested and *only if the evidence supports "heat of passion" voluntary manslaughter*, is an instruction thereon required.

*Id.* at 349, 671 A.2d at 674 (emphasis added).

As the trial court concluded, the evidence at trial did not support a voluntary manslaughter charge. Rather, after two members of Appellant's gang were killed, Appellant and other members of his gang gathered to plan their retaliation. Within one day of the shooting at the North American Motor Inn, and the subsequent meeting of Appellant's gang to plan retaliation, Stokes–Steadley and Moore purchased firearms on Appellant and Bond's respective behalf. Appellant and Bond instructed the women what firearms to purchase and provided the money for the purchases. Two days after Finney and Steed were killed, Appellant and Bond went to the area of Ogden Street, where, after circling the corner twice, Bond exited his vehicle and approached a man who resembled one of the individuals whom Appellant and Bond believed was responsible for shooting Finney and Steed. Upon realizing that it was not the same person, Bond got back into his car. After circling the corner a third time, Appellant and Bond jumped out of the car and opened fire on the victim, Rasheed Grant; the following day, they discovered that the wrong person had been killed. These facts simply do not support a finding that Appellant and Bond acted under a sudden and intense passion;

accordingly, we hold that the trial court did not err in denying Appellant's request for a voluntary manslaughter charge.

## IV. *Brady* Claim

▮▮▮▮▮ Appellant next maintains that he is entitled to a new guilt phase trial because the prosecution withheld evidence in violation of the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[13] In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The duty to disclose may encompass impeachment evidence as well as directly exculpatory evidence, and the prosecution's duty under *Brady* extends to exculpatory evidence in the files of police agencies of the same government prosecuting the case. *Commonwealth v. Lambert*, 584 Pa. 461, 470, 884 A.2d 848, 854 (2005). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. *Id.; see also Commonwealth v. Collins*, 585 Pa. 45, 68, 888 A.2d 564, 577–78 (2005) (in order to establish a *Brady* violation, a defendant "must establish that there has been a suppression by the prosecution of either exculpatory or impeachment evidence that was favorable to the accused, and that the omission of such evidence prejudiced the defendant"). However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." *Commonwealth v. Chambers*, 570 Pa. 3, 29, 807 A.2d 872, 887 (2002) (citation omitted).

**13.** While Appellant references in his Questions Presented a violation of his constitutional rights pursuant to the Pennsylvania and United States Constitutions, he makes no such argument in his brief apart from the alleged *Brady* violation. Thus, we analyze only his *Brady* claim.

Appellant avers that, after his trial, but prior to sentencing, he learned that two detectives who were involved in investigating his case had, on May 12, 2004, interviewed an individual named Hyneith Jacobs during their investigation of the shooting death of a man named Anthony Harris. In his brief, Appellant quotes the following portion of that interview:

Q: Do you know about an incident where someone tried to shoot a guy named "Bucky[?]"

A: Yes, everybody in the neighborhood thought that Bucky, Malik, and Brent killed Bee and Mike at the North American Hotel. So one day a boy named Quincy drove through the neighborhood. He was saying that Bucky was out, down in South Philly. So [Jawayne], Tyray got into Quincy's car and they left. Then I saw on the news the next day that the boy was shot down in South Philly. A couple of days later, I saw Quincy again and I asked him if that was Bucky who got shot in South Philly. I told him I saw it on the news. He said yeah it was. He said that he drove down to where he saw Bucky before. When they got down there, [Jawayne] put on a hat that was in the car and walked right up on him. Like he didn't even see him. Then he said [Jawayne] shot him in the head and just walked off. Then Quincy said they drove back up to the bottom.

Q: Did you ever talk to Tyray about this?

A: No, I didn't want to ask him about it. Quincy already told me what happened.

Q: Do you know if [Jawayne] carries a gun?

A: Yes.

Q: Do you know what kind of gun he carries?

A: A 6 Sigsueur 357. It's mainly a .357 but if you don't have .357's you can shoot .40's out of it.

Appellant's Brief at 25–26.

Appellant asserts that his counsel first became aware of Jacobs' statement when Jacobs testified at a different trial and the statement became part of the evidence. Appellant contends that, had he been aware of the statement during trial

preparation in the instant case, he could have located witnesses who could have testified and raised a reasonable doubt as to whether someone other than Appellant committed the murder. The trial court, in assessing Appellant's claim that he was entitled to a new trial based on a *Brady* violation, determined that Appellant established (1) that the evidence was favorable to Appellant had it been disclosed,[14] and (2) that the evidence was suppressed by the prosecution. The court, however, held that Appellant could not establish the requisite prejudice because evidence that other individuals had motive to kill was already before the jury. *Id.* at 15. Appellant contends that the trial court abused its discretion in this regard. We disagree.

Appellant argues that Jacobs' statement "would have established that [Jawayne] and not anyone else shot and killed the victim." Appellant's Brief at 28. Appellant further avers that, because Jawayne and Appellant were both at the meeting where Richard Brown encouraged retribution against the individuals that killed Finney and Steed, and because Jacobs testified that Jawayne killed the victim, Appellant and Jawayne "were in the exact same position." *Id.* As the trial court noted, however, "Jacobs' statement makes no connection between anyone and the killing of Rasheed Grant at 42nd and Ogden Streets." Trial Court Opinion, 11/15/07, at 15–16. In addition, "the victim referred to in Jacobs' statement was killed in South Philadelphia, a significant distance from 42nd and Ogden Streets which is located on the north side of West Philadelphia." *Id.* at 16. Thus, the statement is not exculpatory. Moreover, we fail to see how Appellant was prejudiced at trial by the Commonwealth's failure to provide information regarding Jacobs' statement about the shooting of an entirely different victim, in a different part of town. For these reasons, Appellant is not entitled to relief.

14. The trial court opined that "the evidence was favorable to appellant in that had it been disclosed appellant would have been aware of Jacobs' existence prompting further investigation, such as locating Quincy and Tyray, interviewing them, possibly subpoenaing them for trial, or using information they could provide to cross-examine Commonwealth witnesses." Trial Court Opinion, 11/15/07, at 14–15.

## V. Shackles at Penalty Phase Hearing

Appellant next argues that he is entitled to a new penalty phase hearing because the trial court, without substantial reason or foundation, required Appellant to be shackled during the penalty phase hearing. Appellant asserts that both he and Bond were shackled at the ankles and were wearing belly chains and handcuffs. The trial court explained its reasons for having Appellant and Bond shackled in the courtroom during the penalty phase hearing as follows:

> Prior to the start of the penalty phase, before the jury entered the courtroom, the Court received information that appellant and the co-defendant were involved in an incident in the cell room that escalated into a fight requiring the intervention of the sheriffs. The sheriffs advised the Court that it was their determination that appellant and the co-defendant represented a danger to themselves, the public and the court staff. In the Court's discretion, having the defendants shackled was appropriate. The court noted appellant's objection and stated on the record that, "based on the incident that occurred in the cell room that morning involving both defendants as well as Bond's reaction after the verdict was read and as he left the courtroom ..., the Court would adhere to the sheriff's decision to take extra precaution in securing the safety of those present." *See, Commonwealth v. Pezzeca,* [749 A.2d 968, 971 (Pa.Super.2000)] (where the trial court approves the use of restraints, the trial court is instructed to state on the record, outside the presence of the jury, its reasons for permitting them). At appellant's request, a curative instruction was given. When the jury assembled in the jury box, the Court instructed them as follows: "You may notice that each of the defendant's are handcuffed. This is normal procedure for this courtroom once a defendant has been found guilty of murder in the first degree. You are not to draw any adverse inference because of this or to permit this to influence you in your decision concerning sentencing in this matter."

Trial Court Opinion, 11/15/07, at 22–23 (record citations omitted).

According to Appellant, the trial court "abdicated its personal responsibility to assess the situation," by relying on the judgment of the sheriffs. Alternatively, Appellant contends that even if the trial court exercised its own judgment, its decision was flawed because there was no substantial basis upon which to order that Appellant "would be handcuffed and shackled and all where the restraints were visible to the jury." Appellant's Brief at 30, 32.

 As this Court acknowledged in *Commonwealth v. Chester,*

> While it is true that the presumption of innocence is removed once guilt has been determined, it cannot be said that the appearance of a defendant in shackles could not influence the jury at the penalty phase. An integral part of the jury's determination whether a defendant should be sentenced to death is the threat of danger the defendant poses to the community. Viewing the defendant in handcuffs and shackles during the penalty phase could have the effect of creating in the minds of the jurors the presumption that the defendant is dangerous and therefore worthy of the death sentence.

526 Pa. 578, 601, 587 A.2d 1367, 1378–79 (1991).

 Nevertheless, as we emphasized in *Chester,* a judge has the responsibility and the authority to maintain a courtroom atmosphere which is conducive to the fair and orderly disposition of the issues presented, and this includes the right to restrain the defendant, if the circumstances so warrant. *Id.* at 602, 587 A.2d at 1379.[15] In ordering that Appellant and

---

**15.** In addressing the appellant's claim in *Chester,* this Court noted:

> The trial judge in the instant matter apparently believed, in his discretion, that restraint of the defendants was necessary for the security of the courtroom. Since trial counsel did not object at that point, we can assume only that the judge's belief was justified. There is no evidence of record that the judge abused his discretion. Accordingly, this contention must be rejected.

526 Pa. at 602, 587 A.2d at 1379 (footnote omitted).

Bond be shackled in the courtroom during the penalty phase, the trial court considered the information it received from the sheriffs, and agreed with the sheriffs' opinion that restraints were necessary. Appellant fails to offer any argument as to why the trial court's reliance on the information provided by the sheriffs was improper, or how such reliance negated the trial court's own "independent decision" as to whether restraints were necessary.

 Appellant also asserts in his brief that the information provided by the sheriffs did not constitute a substantial basis upon which to require Appellant and Bond to be shackled, suggesting that, even if a fight had occurred, Appellant simply may have been "righteously defending himself." Appellant's Brief at 32. Appellant, however, failed to offer this as an explanation for his behavior before the trial court. Moreover, as noted above, the trial court specifically advised the jury that it was normal procedure for a defendant convicted of first-degree murder to be restrained in the courtroom; thus, Appellant cannot demonstrate that he suffered any prejudice as a result of being restrained. For all of these reasons, Appellant is not entitled to relief on his claim.

## VI. Failure to Sever Penalty Phase Hearings

 Appellant next argues that he should be awarded a new penalty phase hearing due to the alleged error by the trial court in denying requests by both Appellant and Bond for separate penalty phase hearings. The decision whether to sever trials of co-defendants is within the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of that discretion. *Commonwealth v. Lopez,* 559 Pa. 131, 160, 739 A.2d 485, 501 (1999). The determinative factor is whether the defendant has been prejudiced by the trial court's refusal to sever his trial, and it is the burden of the defendant to establish such prejudice. *Id.*

As support for his claim that he was prejudiced by the trial court's refusal to sever his penalty phase hearing from Bond's, Appellant notes that the prosecutor made comparisons be-

tween Appellant and Bond which were unfavorable to Appellant.[16] Appellant also suggests that the real reason he and Bond were shackled in the courtroom was because Bond had three separate outbursts during the trial. Finally, Appellant suggests that the jury may have "imputed" the outbursts made by Bond during the proceedings to Appellant.

In arguing that the trial court should have severed the penalty phase hearings, Appellant concedes that Pennsylvania's Death Penalty statute requires the same jury that renders a verdict to determine the penalty. *See* 42 Pa.C.S.A. § 9711(a)(1). Appellant, however, urges this Court to abandon this rule; alternatively, he suggests that the trial court could have conducted separate penalty phase hearings using the same jury.

Initially, we note that the prosecutor's unfavorable comparisons between Appellant and Bond, as well as the shackling of Appellant and Bond, occurred during the penalty phase hearing, *after* the trial court denied the request for severance. Thus, the trial court could not have abused its discretion in failing to grant severance based on these incidents.

■■■ With respect to Appellant's argument that severance was necessary due to the prejudicial effect of Bond's outbursts at trial, the Commonwealth maintains that Appellant waived this issue because he failed to offer these arguments in the court below. *See Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162 (1999). The Commonwealth notes that Bond's counsel first moved for separate penalty phase hearings on the basis that Appellant planned to present evidence from a psychologist "that really doesn't apply to [Bond]" and that Appellant "has a murder conviction or attempted, whatever that is, we don't." N.T. Trial, 5/6/05, at 177. Appellant joined the motion, but did not offer any additional reasons in support thereof. The Commonwealth further asserts that Appellant's claim is waived because he failed to state in his Pa.R.A.P. 1925(b) statement why the trial court erred in denying the motion for severance.

16. The statements of the prosecutor are discussed in detail *infra*.

In *Arroyo*, this Court noted that it "is beyond cavil that 'if the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived.'" 555 Pa. at 142, 723 A.2d at 170. The record reveals that, in joining his co-defendant's request for severance of the penalty phase hearings, Appellant did not argue that Bond's outbursts at trial would reflect poorly on him; thus, he cannot now argue this as a basis for severance.

## VII. Improper Completion of Verdict Form

Appellant next contends that he is entitled to a new penalty phase hearing because the trial court erred in refusing to grant a mistrial, or, alternatively, impose a sentence of life imprisonment, after the jury returned its verdict slip without indicating whether it found any mitigating circumstances. When the jury returned from its deliberations, the jury foreperson announced the verdict and the jurors were individually polled as to the sentence of death recommended for each defendant. The verdict was recorded, and the court thanked the jurors for their service and excused them, at which time they returned to the jury room to collect their belongings. Almost immediately, Appellant's counsel noted that the jury allegedly left a portion of the verdict slip blank, namely, the portion relating to mitigating circumstances. It was also alleged that the jury failed to complete the final page of the verdict sheet that referred to life imprisonment. By this time, the jurors had been in the jury room for approximately one minute, with no outside contact or intervention. Over defense counsel's objection, the trial judge called the jurors back into the courtroom and advised them that they needed to return to the jury room to complete the verdict slip, specifically indicating whether or not any mitigating circumstances had been found by any individual juror. The jury completed the form, indicating that there were no mitigating circumstances. The jury also indicated "N/A" on the final page of the verdict sheet referring to a sentence of life imprisonment. When the jurors were recalled to the courtroom, they were individually polled,

and each juror agreed no mitigating circumstances were found.

The Commonwealth contends that Appellant waived this claim by failing to raise it in his original Rule 1925(b) statement. *See* Commonwealth Brief at 51. We agree Appellant failed to do so, but further recognize that, on April 17, 2006, Appellant filed a *supplemental* 1925(b) statement wherein he raised this sole issue, and that the trial court addressed the issue on the merits in its opinion. However, the docket does not indicate that Appellant requested, or was granted, permission by the trial court to file a supplemental 1925(b) statement, and arguably his supplemental filing was thus insufficient to avert waiver. *See Commonwealth v. Woods,* 909 A.2d 372, 377–78 (Pa.Super.2006) (holding, under prior version of Pa.R.A.P.1925, an appellant may not file an untimely supplemental 1925(b) statement without leave of court, and an attempt to unilaterally reserve the right, in the original 1925(b) statement, to file a supplemental statement will not suffice). Moreover, the fact that the trial court addressed the issue in its 1925(a) opinion would not save Appellant's claim. *See Commonwealth v. Castillo,* 585 Pa. 395, 403, 888 A.2d 775, 780 (2005) (any issues not raised in a 1925(b) statement will be deemed waived, regardless of whether the trial court addresses the issue). Regardless, even if Appellant's claim is not waived, he is not entitled to relief, for the same reasons that we rejected a similar claim raised by Appellant's co-defendant Bond on appeal. *See Commonwealth v. Bond,* 604 Pa. 1, 985 A.2d 810 (2009).

## VIII. Statutory Review of Death Penalty Verdict

Finally, Appellant contends that he is entitled to a new penalty phase hearing because the death penalty verdict was imposed as a result of passion, prejudice, and arbitrary factors.[17] Indeed, pursuant to the Sentencing Code, this Court is required to conduct a statutory review of the death sentence and we must affirm the sentence unless we determine that:

17. Appellant presented this argument as the sixth issue in his brief; we address it last, however, because it is our practice to do so.

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance.

42 Pa.C.S.A. § 9711(h)(3). After careful review, we conclude that the sentence of death was not a product of passion, prejudice, or any other arbitrary factor, and that the evidence supports the jury's finding of at least one aggravating circumstance.

As noted above, the jury found three aggravating factors, including that Appellant was serving a life sentence following his conviction in a federal conspiracy case, 42 Pa.C.S.A. § 9711(d)(10); Appellant had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S.A. § 9711(d)(9); and Appellant, in the commission of the offense, knowingly created a grave risk of death to another person in addition to the victim, 42 Pa.C.S.A. § 9711(d)(7). As the trial court noted in its opinion, the evidence supported the finding of each of these factors:

Testimony during the penalty phase indicated that, in addition to Grant being killed during the shooting, Antwoin Weston, who just happened to be out on the street the night of the murder, was shot and wounded. Several other people were also present on the street at the time of the shooting. Additionally, evidence was presented that appellant was convicted of two violations of Title 18 United States Code 924C, possession or use of a firearm in furtherance of a drug trafficking crime. One conviction involved the shooting death of Graylin Craig in January of 2000. In May 2004, appellant was convicted of aggravated assault in the shooting of one Michael Henderson. Henderson was not killed.

Trial Court Opinion, 11/15/07, at 26–27 (record citations omitted). Indeed, Appellant does not dispute the finding of any of the aggravating factors. As the jury found no mitigating factors, Appellant's sentence of death was mandated. *See* 42 Pa.C.S.A. § 9711(c)(1)(iv) ("the verdict must be a sentence of

death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance").

Appellant, however, argues that the verdict of death was the product of the following arbitrary factors:

(a) The co-defendant's [Bond's] behavior and outburst during the trial.

(b) The prosecutor's most egregious argument when he compared the two Defendants.

(c) Where evidence was placed before the jury concerning a prior event and where the Commonwealth argued that [Appellant] had committed a Murder but where [Appellant] had never been charged with that Murder and where a Certified Record of Conviction could not be produced and where testimony of the Special Agent involved in that federal case could not testify that [Appellant] had been convicted of Murder.

Appellant's Brief at 33. We find no merit to Appellant's claims.

To the extent Appellant suggests that his death sentence was based on the outbursts of Bond at trial, the Commonwealth argues that Appellant has waived this claim "for want of argument." Commonwealth's Brief at 38–39. Indeed, Appellant's argument on this issue is as follows: "The outbursts of the codefendant have been argued above and will not be again recited; however the undersigned would incorporate his arguments made herein." Appellant's Brief at 33. As the Commonwealth points out, however, Appellant's only prior argument involving Bond's outbursts at trial related to the use of physical restraints, *see* Appellant's Brief at 32, and he has failed to offer any argument explaining how Bond's behavior at trial rendered Appellant's sentence "arbitrary." Additionally, the Commonwealth points out that Appellant fails to identify in the record any such "outbursts." We agree that by failing to properly develop his argument, with proper citation to the record, Appellant has waived his claim. *See Commonwealth v. LaCava*, 542 Pa. 160, 188, 666 A.2d 221, 234–35

(1995) (failure to identify where in the record alleged prejudicial comments were made resulted in waiver).

■■■ Appellant next asserts that the prosecutor, "in unconstitutional fashion," improperly made the following comparison between Appellant and Bond during his closing argument at the penalty phase hearing:

> [Appellant] comes from a good family. How many times do we go to these [trials] and this doctor has testified in numerous hearings that they come from broken homes. He didn't come from a broken home where there's no income or mom isn't present or dad isn't present. Those are good folks. Mom was there. Dad was there. They were working.
>
> Contrast that to Mr. Bond to some extent because he didn't have a mother, so maybe you can take that into account the fact that she was in Inglis House [18] or wherever it was, but he [Appellant] had everything, brothers and sisters who loved him.

N.T. Trial, 5/10/05, at 115–116. Appellant's counsel objected, and the trial court overruled the objection.

■■■■ In *Commonwealth v. Washington*, 549 Pa. 12, 700 A.2d 400 (1997), this Court explained:

> The prosecutor is allowed to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence. In considering a claim of prosecutorial misconduct, our inquiry "is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect one." Thus, a prosecutor's remarks do not constitute reversible error unless their " 'unavoidable effect ... [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.' " Further, the alleg-

18. Inglis House is a home for disabled individuals where Bond's mother lived because she had multiple sclerosis. N.T. Trial, 5/9/05, at 86–87.

edly improper remarks must be viewed in the context of the closing argument as a whole.

*Id.* at 27, 700 A.2d at 407–08 (citations omitted). Viewing the prosecution's closing argument, which encompassed nearly 20 pages of the trial transcript, as a whole, we find no basis to conclude that the unavoidable effect of the comments was to compromise the ability of the jury to render a true verdict.

In rejecting Appellant's claim, the trial court noted that Appellant had presented the testimony of family members, who testified that they loved him, did not want to see him put to death, and that he was a good father. Trial Court Opinion, 11/15/07, at 28. The trial court thus determined that the prosecutor's comments were based on evidence that Appellant himself introduced at the penalty phase hearing.

Likewise, the Commonwealth points out that Appellant presented testimony that portrayed him as an individual who was raised in a stable and loving home. Indeed, Appellant's counsel stated during his closing argument:

> What I think we have here ... is the core element of decency in his family and friends' setting, but definitely somehow led down the wrong path in life that nobody can explain up until now and his family and friends didn't see it.

> It was Christopher Smith's private life, but I'm going to suggest to you that if he didn't at least have that core element of humanity and core decency, that his friends and family and others would have seen that, but we don't have that here. We don't have it here. That's another mitigating factor.

N.T. Trial, 5/10/05, at 143–44.

The prosecutor was entitled to challenge Appellant's argument that the jury should consider his family background as a mitigating circumstance. *See Commonwealth v. Copenhefer,* 553 Pa. 285, 316, 719 A.2d 242, 257–58 (1998) ("A prosecutor may argue to the jury that it should not attach any substantial weight to the mitigating circumstances presented by the defense."). Further, the prosecutor, in making the comment to which Appellant objects, did not so much "compare" Appellant

and Bond as co-defendants, as offer an example of what, in the prosecutor's view, might constitute a legitimate example of mitigating circumstances. Moreover, as the trial court further noted, Appellant fails to explain how he was prejudiced by the prosecutor's remarks. Accordingly, Appellant is not entitled to relief.

 Finally, we reject Appellant's argument that his death sentence should be overturned because the trial court, over Appellant's objection, allowed the admission of evidence that Appellant had been convicted of murder without a Certified Record of Conviction.[19] As the trial court properly recognized in its opinion, the prosecution is permitted to examine the facts surrounding a defendant's prior felony convictions so that a jury may assess whether those prior crimes involved violence sufficient to support aggravating circumstances. *See Commonwealth v. Sattazahn*, 563 Pa. 533, 545, 763 A.2d 359, 365 (2000). Moreover, evidence of prior convictions is not limited to a certified record. *Commonwealth v. Young*, 536 Pa. 57, 72, 637 A.2d 1313, 1320 (1993). Thus, Appellant is not entitled to relief on this claim.

In conclusion, we are satisfied that the jury's sentence of death was not the product of passion, prejudice, or any other apparent arbitrary factor, but was based upon the evidence admitted at trial.

Accordingly, we affirm the verdict and the sentence of death imposed upon Appellant by the Court of Common Pleas of Philadelphia County.[20]

19. Although Appellant identifies this particular argument as a separate question in his Questions Presented, *see* Appellant's Brief at 3 ("Is [Appellant] entitled to a new Penalty Hearing, where the Court permitted evidence of [Appellant's] federal conviction, but without requiring that the Commonwealth produce record of said conviction?"), he presents his argument on this issue under the passion/prejudice portion of his brief.

20. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S.A. § 9711(i).

Chief Justice CASTILLE, Justices EAKIN, BAER, McCAFFERY and GREENSPAN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurs.

I join the majority opinion except for its treatment of the prosecutor's remark comparing the two co-defendants at the penalty hearing. Both defendants had moved for severance of the penalty phases, in part to avoid such comparisons or other irrelevant considerations from spilling over from one defendant to the other. As recounted by the majority, after these motions were denied, the district attorney ultimately argued in closing that Appellant "comes from a good family" and that the jury should "[c]ontrast that to Mr. Bond to some extent because he didn't have a mother, so maybe you can take that into account[.]" N.T., May 10, 2005, at 115–16 (*quoted in* Majority Opinion, *op.* at 162, 985 A.2d at 907). The majority presently rejects Appellant's assertion that this injected an arbitrary factor into the sentencing proceedings, in part because the prosecutor "was entitled to challenge Appellant's argument that the jury should consider his family background as a mitigating circumstance." Majority Opinion, *op.* at 163, 985 A.2d at 908.

Insofar as the majority's explanation can be construed as an endorsement of the district attorney's tactic, I respectfully demur. Particularly in the capital sentencing arena, I believe this Court should be careful to safeguard the individualized nature of the sentencing decision. *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality) (articulating that the Eighth Amendment requires a reliable, individualized process for capital sentencing); *cf. Commonwealth v. Hughes*, 581 Pa. 274, 363, 865 A.2d 761, 815 (2004) (noting that, where aggravating and mitigating circumstances are found, the selection aspect of capital sentencing entails a highly individualized weighing process). Here, the prosecutor undoubtedly sought to gain leverage against Appellant by reference to Bond's childhood difficulties, although such difficulties had no relevance to Appellant's character or the circumstances of the offense of

which Appellant was convicted. Accordingly, I would not place this Court's imprimatur on the district attorney's remark. Nevertheless, in the context of the penalty hearing as a whole, the comparison between the upbringings of the two co-defendants constituted only a limited portion of the Commonwealth's extensive closing argument, and was not so severe or egregious, in my view, as to require a new sentencing hearing. On this basis, I am able to join the result reached by the majority on this claim.