J-S64021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DUSTIN TYLER THOMAS :
:
Appellant : No. 491 WDA 2019

Appeal from the Judgment of Sentence Entered September 25, 2018
In the Court of Common Pleas of Clearfield County Criminal Division at
No(s):  CP-17-CR-0001021-2017

BEFORE:   BOWES, J., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:          **FILED DECEMBER 11, 2019**

Dustin Tyler Thomas appeals from the judgment of sentence, entered in

the Court of Common Pleas of Clearfield County, following his conviction of

first-degree murder for the killing of his friend's brother.  After our review, we

affirm.

On the evening of October 30, 2017, at approximately 5:00 p.m.,

Thomas and the victim, Brett Bamat, went to the home of Tim and Valerie

Bamat (the victim's brother and sister-in-law), to help Valerie with chores.

The victim's brother, Tim, was incarcerated at that time at Perry County

Prison.  N.T. Jury Trial, 8/13/18, at 43-45.  While at the Bamat home, Thomas

and the victim were drinking alcohol, *id.* at 47, and Thomas had a gun

_____

[*] Retired Senior Judge assigned to the Superior Court.

holstered at his side which, he testified, he wears "[a]lmost every day[,]" for "[s]elf-defense." N.T. Jury Trial, 8/15/18, at 214.

When the chores were completed, Valerie, Brett and Thomas went into the house. Valerie got a phone call from Tim; she told Tim who was at the house with her and Tim told her he did not want Thomas at their home. N.T. Jury Trial, 8/13/18, at 46. Valerie relayed this message to Thomas, and she testified that at that point Thomas' "face turned red, and he began to cry." *Id.* She acknowledged that her husband, Tim, and Thomas had been good friends, and that they "called each other brother all the time." *Id.* at 89. Thomas testified that Tim was his "best friend." *Id.* at 211. Valerie also stated that she had told Thomas a week before that Tim did not want him around. Regarding the day of the incident in question, Valerie testified as follows:

> A: And at that point, I mean, he just became very distraught about having to leave. . . . He walked up to Brett and got in his face and said that I'm more of a brother to Tim than you'll ever be. . . . Then not too far after he had said that, that's when[] he did get the gun out of his holster and put it in his hand and said about it being his muscle.
>
> Q: And who did he say that to?
>
> A: To Brett.
>
> Q: And what happened?
>
> A: And then Brett looked at him and he said, well, this is my muscle. And he made a muscle like this. And then he said, if you want to go outside, we can go outside. . . . [Thomas] put the gun away. And then everything ceased at that point. And then they went into the living room. . . . So then Brett was explaining to [Thomas] how whenever he was messing

with the [compound] bow, he actually turned it up instead of turning it down, so it was hard to pull back. So when he was trying to pull it back, [Thomas] said, what kind of man are you? You can't even pull a bow back. . . . And then at that moment, Brett went over to the window to do something. I'm not quite sure what he was doing. And that's when[] [Thomas] pulled the gun back out of his holster.

Q: Did you see him pull the gun out again?

A: Yes, and put it right here.

Q: Pulled the gun out and was hiding it. For the record, you're making a motion like he's holding the gun behind his back.

A: Yes. . . . And then after he held that gun behind his back, Brett turned around and saw his arm behind his back; and he said, why do you have your gun out? And [Thomas] looked at him and said, "Are you confronting me?" And that's when[] he put the gun back in his holster. And then [Thomas] pushed Brett and, of course, Brett pushed back.

Q: Is this inside the residence?

A: Yes. . . . It was like a slight shove. . . . And then I said, you know, how about we go outside, because they're pushing. And then they knocked into my TV, so I just said, hey, how about we all go outside, because at that point is when we are ready to leave anyways to go to my mother-in-law's house for supper.

Q: Okay. So were you taking anything outside?

A: Yes. We were taking the food outside. . . . Brett was taking it outside. . . . So we all go outside. He's taking the items to the car. And I'm on the porch at this point facing [Thomas] to get him to leave. I'm just telling him, you know, let's go, we want to leave because Brett and I are trying to go to eat supper with Patty.

Q: So does he know you're going to Patty's and that he's not . . . invited. . . . Is that a fair depiction?

A: Yes. So then I'm standing there and then Brett walks away from the car and comes up around on to the steps.

And as soon as he comes up to the step, that's when[] [Thomas] looked over at him and says, "Are you confronting me?"

Q: Was Brett confronting him?

A: No. . . . So Brett just kind of walked up onto the porch, and then [Thomas] starts pushing him again like they did inside.

Q: Who starts pushing who when this goes on?

A: [Thomas] starts pushing Brett.

Q: Did Brett ever push [Thomas] first?

A: No. . . .  So then, as he's pushing him, I'm up against the corner of my back porch, and it's not very big.  And as I'm back against the wall on the porch, I go inside, because my dog's going crazy inside.  So I go inside to . . . calm down my dog, and no sooner do I walk into the house is when the gunshot went off. . . . I would say not even – maybe 20 seconds. . . .

Q: So do you see [Thomas] after the gunshot goes off?

A: Yes.

Q: And did you see where the gun was at that time?

A: It was in his holster.

Q: So what happened?

A: So I followed him to his vehicle . . .  he's sitting there just emotionless.

Q: Does he get in the vehicle?

A: Yes.  And I asked him if he's going to help me.  Help me with Brett.

Q: Did he say anything?

A: No.

Q: Okay.  What happened?

A: So I walk away, and I hear another gunshot.

Q: Okay. Where did that gunshot come from?

A: From his vehicle.

Q: Okay. So what happened?

A: So then I run back to his vehicle to get the gun and told him it needs to be in safe hands.

Q: Did he give it to you?

A: No. . . . He went and put it back in his holster. . . . He says, I just want to kill myself. So I said, "That's not going to help the situation." And then he says, "Well, then I just want to go home." He went and backed out of my driveway and drove off. . . . I went to walk up to Brett to see what happened, and when I got to him . . . He was on his left side in a fetal position. So when[] I flipped him over, he had a bullet wound to his chest. In his heart. . . . Before I got to Brett I called my mother-in law, Patty, to let her know that Brett had been shot. And then she, of course, said, you know, call 9-1-1. So I went ahead [and] called 9-1-1. So while I was on the phone with them, that's when[] I walked over to him and saw the situation at hand; and then that's when 9-1-1 told me to start to begin giving him chest compressions.

Q: And did you do that?

A: Yes. And then while I was doing that, my mother-in-law showed up. And the police arrived. . . . And then once the ambulance arrived, they took over.

Q: Prior to [Thomas] leaving, were you able to observe him and see, you know, specifically was he able to walk, you know? Did he have any problems walking? How was his coordination?

A: He was perfectly coordinated.

Q: How was his speech? Was he able to communicate and talk with you?

A: Yes.

Q: When he was talking with Brett, was he having problems communicating or —

- 5 -

A: No.

Q: So he was able to talk and walk and — drive a vehicle?

A: Correct.

*Id.* at 46, 49-63.

About one hour later, at approximately 9:30 p.m. that night, Thomas returned to his home. He was met by several state troopers. After a struggle that required Sergeant Michael Gray to use a Taser, Thomas was taken into custody. *Id.* at 143-45. The officers testified that, while transporting Thomas to the police station and while at the police station, they smelled alcohol; they also testified that Thomas was occasionally crying, but he was able to walk and respond appropriately.

About three hours later, at approximately 12:30 a.m., Thomas was asleep on the floor of the interview room, with one arm handcuffed to a rail. N.T. Jury Trial, 8/14/18, at 136-62. Detective David Allen Ray testified that he attempted an interview at that time, but Thomas was intoxicated, lethargic, and speaking incoherently. Detective Ray suggested Thomas be transported to the hospital for a safety check. *Id.* at 178. At that point, Detective Ray had to assist Thomas to the police vehicle. At the hospital, a gunshot residue test, *id.* at 183, and a blood alcohol test, indicating a .197 percent blood alcohol level at 1:53 a.m., were performed on Thomas. N.T. Jury Trial, 8/15/18, at 33.

At trial, Harry Nachlas Kamerow, M.D., a pathologist, testified that he performed an autopsy on the victim on October 31, 2017. He testified that

the bullet entered the victim's left chest and traveled in a downward left-to-right trajectory, rupturing the right ventricle and lacerating the right lobe of the liver. N.T. Jury Trial, 8/14/18, at 32. Dr. Kamerow testified that in his professional opinion the cause of death was a gunshot wound to the chest, and the manner of death was homicide. *Id.* at 35.

Thomas also testified. He stated that Tim, Valerie's husband, was "his best friend. He was like my brother." N.T. Jury Trial, 8/15/18, at 193. He also testified that he was aware that before Tim left for his incarceration, Tim had said he did not want him around the house or around Valerie. *Id.* at 195. He characterized his relationship with Brett, the victim, as "[f]riends." *Id.* at 194. With respect to the events of October 30, 2017, Thomas testified on direct examination as follows:

> Q: Did you become upset when Valerie said that Tim didn't want you there?
>
> A: No.
>
> Q: Do you remember doing any of the chores as the house?
>
> A: Yes.

*Id.* at 201. He also testified that he remembered drinking whiskey while he and Brett were doing chores and his next memory is of waking up in jail. *Id.* at 201-205. He stated that he thought he was incarcerated because of "a DUI." *Id.* at 205.

Following his conviction, the court sentenced Thomas to life imprisonment on September 18, 2018. On appeal, he raises the following claims:

1. Whether the [trial court] erred when, on August 16, 2018, it declined to instruct the jury on the charge of voluntary manslaughter?

2. Whether the trial court erred when, on August 16, 2108, it accepted the guilty verdict on the charge of murder of the first degree, where the verdict was against the weight of the evidence with regard to the element(s) of the offense, and subsequently sentenced [Thomas] to life without parole on said charges on September 18, 2018?

3. Whether the trial court erred when, on February 22, 2019, it denied [Thomas'] post-sentence motion which argued that the District Attorney engaged in prosecutorial misconduct?

Appellant's Brief, at 5.

Thomas first argues that the trial court erred in refusing to charge the jury on the offense of voluntary manslaughter, claiming the evidence supported a finding that he killed the victim as a result of "heat of passion" after learning that his friend Tim did not want him at his home. We find this issue waived. *See* Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate.") (emphasis added). *See also* Pa.R.A.P. 302(b) ("A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of.").

Here, the trial court held an on-the-record discussion in chambers with counsel regarding proposed jury instructions. The court stated it "did not hear any testimony whether there was intense passion from anyone, . . . I don't see that there was testimony, the heat of passion type[.]" N.T. Jury Trial, 8/15/18, at 227. At that time, defense counsel appeared to agree with the court. Defense counsel stated, "The instruction does say sudden resentment, and I think that that might be part of [the District Attorney's] story that he's trying to tell. *But there was no testimony as to even that*." **Id.** (emphasis added). The District Attorney, contrary to what defense counsel had surmised, stated, "I don't think that there's any evidence to support a voluntary manslaughter charge. I think that it's an inconsistent charge with the voluntary intoxication." **Id.**

The trial court reiterated:

[T]he Court did not hear any testimony whether there was provocation, heat of passion . . . . The only thing I heard was there might have been a shoving back and forth. I don't think that rises to the level of provocation. So I'm not going [to] read the voluntary manslaughter/murder in issue.

**Id.** The trial court concluded:

The Court: I am not putting the voluntary on. But if you want to object, you may

Defense Counsel: Thank you.

**Id.** at 230. When the jury returned to the courtroom, the court gave the jury instructions, concluding as follows:

> The Court: Counsel, I believe I have covered all of the submitted points for charge. Is there anything additional either of counsel wish the court to charge?
>
> District Attorney: Nothing from the Commonwealth.
>
> Defense Counsel: I don't believe so, your Honor. Thank you.

N.T. Jury Trial, 8/16/18, at 100. Counsel made no objection, and at this point, the jury was dismissed for deliberations.

Defense counsel's failure to specifically object at the close of the instruction, particularly where the court concluded by questioning counsel if there is "anything additional either of counsel wish the court to charge," renders the claim waived. *See Commonwealth v. Powell*, 956 A.2d 406, 422 (Pa. 2008) (defendant waived claim that trial court erred at trial for capital murder in not giving jury instruction on involuntary manslaughter, where defendant did not request instruction on involuntary manslaughter despite being asked by trial court if he had anything to add at close of jury charge); *see also Commonwealth v. Betz*, 664 A.2d 600 (Pa. Super. 1995).[1]

---

[1] Although we agree with the trial court and the Commonwealth that Thomas cannot now be heard to complain when no specific objection was made, our review of the transcripts indicates that Thomas' claim is meritless. The Crimes Code defines voluntary manslaughter as an unjustified killing committed while the perpetrator was acting "under a sudden and intense passion resulting from serious provocation by the victim." 18 Pa.C.S.A. § 2503(a)(1). The Pennsylvania Supreme Court has held that for purposes of section 2503, "sudden and intense passion" encompasses emotions such as anger, rage, sudden resentment, or terror that renders the mind incapable of reason. *Commonwealth v. Browdie*, 671 A.2d 668 (Pa. 1996). The record is devoid of evidence that at the time the victim was murdered, Thomas was acting under a sudden or intense passion brought on by the victim. *See*

Next, Thomas challenges the weight of the evidence.[2] He argues that the verdict was so contrary to justice as to "shock one's conscience, particularly with respect to the specific intent element, which distinguishes first-degree murder from all other forms of criminal homicide." Appellant's Brief, at 18. Thomas claims that the only evidence of his state of mind was circumstantial, and that [e]ven if the jury completely disregarded [his] testimony that he had no recollection of the killing (or his attendant state of mind) as unreliable and lacking credibility, there is still no direct evidence to establish that [he] had any intention to kill Mr. Bamat." *Id.* at 19.

> A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's

---

*Commonwealth v. Ragan*, 743 A.3d 390, 397 (Pa. 1999); *Commonwealth v. Miller*, 987 A.2d 638 (Pa. 2009). Our Supreme Court has also held that "a trial court should not instruct a jury on legal principles which bear no relationship to the evidence presented at trial." *Commonwealth v. Solano*, 906 A.2d 1180, 1190 (Pa. 2006).

[2] In its Pa.R.A.P. 1925(a) opinion, the trial court states that this issue iswaived for failure to file a post-sentence motion. Nonetheless, the trial court did address the merits of the weight issue in its opinion. *See* Trial Court Opinion, 7/15/19, at 8. Thomas, however, did file a timely post-sentence motion on September 26, 2018, and in that motion, he raised the weight of the evidence claim. *See* Post-Sentence Motion, 9/26/18, at 2. *See also* Pa.R.Crim.P. 607(A). Since our review is limited to the court's discretion, we need not remand for review.

discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Smith*, 985 A.2d 886, 897 (Pa. 2009) (quoting *Commonwealth v. Diggs*, 949 A.2d 873, 879 (Pa. 2008)). After our review, we find no abuse of discretion.

In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. *See* 18 Pa.C.S.A. § 2502(d); *Commonwealth v. Spotz*, 759 A.2d 1280, 1283 (Pa. 2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d). The Commonwealth may prove that a killing was intentional *solely through circumstantial evidence*. *Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001). The finder of fact may infer that the defendant had the specific intent to kill the victim based on the *defendant's use of a deadly weapon upon a vital part of the victim's body*. *Id.*

The evidence presented at trial, as detailed above, established that Thomas used a deadly weapon on a vital part of the victim's body, from which the jury could infer that Thomas had the specific intent to kill the victim. Notably, several witnesses, including Thomas, testified as to his drinking alcohol and intoxication levels at various times during that night. Additionally, the defense presented an expert medical toxicologist, Dr. Lawrence Guzzardi,

who testified, using "retrograde extrapolation," as to his estimation of Thomas' "blood-alcohol concentration" at the time of the killing. N.T. Jury Trial, 8/15/18, at 31-32. Further, the court instructed the jury on voluntary intoxication, specifically that Thomas "is permitted to claim as a defense that he was so overpowered by intoxicants that [he] was incapable of forming the specific intent to kill required for first[-]degree murder. . . . Voluntary intoxication may reduce a murder from first[-]degree to third[-]degree but no lower." N.T. Jury Trial, 8/16/18, at 77-78. The value of such evidence is generally for the finder of fact, who is free to believe or disbelieve any, all, or none of the testimony addressing intoxication. *Commonwealth v. Fletcher*, 861 A.2d 898, 908 (Pa. 2004).

Simply stated, the factfinders in this case chose not to believe that Thomas suffered an "alcoholic blackout," or was so intoxicated *at the time he shot the victim* that he was unable to form the requisite intent. This was within the province of the jury. *See Commonwealth v. Cousar*, 928 A.2d 1025, 1032–33 (Pa. 2007) ("[T]the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence."). Thus, the trial court acted within its discretion in rejecting Thomas' weight-of-the-evidence claim. *Smith*, *supra*.

In his final claim, Thomas argues the trial court erred in denying his post-trial motion for a new trial, claiming the District Attorney engaged in prosecutorial misconduct. Thomas contends the District Attorney "employed tactics that were unduly prejudicial to [him], the cumulative effect of which

was to create hostility in the minds of the jury and deny him a fair trial." Appellant's Brief, at 25. We disagree.

> [P]rosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. . . . In reviewing a claim of improper prosecutorial comments, our standard of review is whether the trial court abused its discretion. When considering such a claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one, because not every inappropriate remark . . . constitutes reversible error.

*Commonwealth v. Noel*, 53 A.3d 848, 858 (Pa. Super. 2012) (citations omitted).

First, Thomas points to the District Attorney "repeatedly interrupting" Dr. Guzzardi's testimony. The District Attorney objected three times during defense counsel's extensive direct examination of Dr. Guzzardi, *see* N.T. Jury Trial, 8/15/18, at 4-43, and the court sustained two of those objections and overruled one. *Id.* at 24, 25, 28. Doctor Guzzardi's *curriculum vitae* and expert report were admitted without objection. Thomas' characterization of the prosecutor's actions as repeated interruption is not supported in the record.

During cross-examination, the District Attorney did ask the court to hold Dr. Guzzardi in contempt for failing to give responsive answers; the court denied this request. *Id.* at 48. Notably, the court on several occasions during cross-examination admonished Dr. Guzzardi on his lack of responsiveness. *Id.* at 46, 48, 50, 51. Although the District Attorney's request may have been

overzealous, "[n]ot every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial." ***Commonwealth v. Spotz***, 47 A.3d 63, 98 (Pa. 2012), quoting ***Commonwealth v. Spotz***, 18 A.3d 244, 288 (Pa. 2011) ("*Spotz VI*"). We do not find the prosecutor's objections or his request to the court to hold the witness in contempt unavoidably formed a "fixed bias and prejudice" against Thomas in the minds of the jurors. ***Id.***

With respect to Thomas' complaint that the District Attorney "questioned [Dr. Guzzardi's] credentials as a toxicologist," Appellant's Brief, at 25, we simply note that this is the purpose of cross-examination. Further, Thomas' general challenge fails to explain how the District Attorney's cross-examination of Dr. Guzzardi's credentials was improper. After reviewing the record, we do not find that the District Attorney "exceeded the appropriate level of civility[.]" ***Commonwealth v. Baez***, 720 A.2d 711, 733 (Pa. 1998).

Thomas also points to the following exchanges, arguing that in cross-examining him, the District Attorney intended to distract the jury from the Commonwealth's burden of proof:

> DISTRICT ATTORNEY: So you admit you arm yourself, put on this pistol, this holster, put on that pistol, you go to the state store, you buy Bird Dog whiskey, you drink Bird Dog whiskey. You admit all that. Right?
>
> A:     I didn't take the firearm into the state store.
>
> Q:     Were you wearing this gun while you're drinking Bird Dog whiskey?
>
> A:     Yes.
>
> Q:     There you go. Were you wearing –

ATTORNEY COOPER:  Objection. . .  Your Honor, objection to the commentary there we go.  When Mr. Shaw gets an answer that he likes, he tends to say there you go or there we go.

THE COURT:  Mr. Shaw, please curtail your commentary after the answers.

N.T. Jury Trial, 8/15/18, at 216-17.    Thereafter, the District Attorney questioned Thomas why he should not be held responsible, and Thomas replied, "No.  I think I should be."  The questioning continued:

Q:    So your position is you should be held responsible?

A:    That's generally what happens.

Q:    So why are we here?

*Id.* at 218.

At that point, defense counsel objected and the court sustained the objection.  *Id.*   The District Attorney then concluded his cross-examination; defense counsel declined any redirect examination and the defense rested. *Id.* at 218-19.  Counsel did not request a curative instruction or a mistrial. This claim, therefore, is waived.  *See Commonwealth v. Jones*, 460 a.2d 739, 741 (Pa. 1983); *see also Commonwealth v. Brown*, 359 A.2d 393 (1976) (where objection to prosecutor's comment was sustained and defense counsel requested neither mistrial nor curative instructions, defense counsel was granted all relief that was requested); Pa.R.Crim. 605.  Even if the issue were not waived, we would find this fleeting expression of frustration on the part of the District Attorney was not prejudicial.   *Commonwealth v. Bedford*, 50 A.3d 707, 715–16 (Pa. Super. 2012) (en banc) (prosecutor's

statements to jury do not occur in vacuum and we view them in context; even if improper, they generally will not form basis for new trial unless comments unavoidably prejudiced jury and prevented true verdict).

Lastly, Thomas points to the District Attorney's closing argument.

> With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that in reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made. Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial.

***Commonwealth v. Judy***, 978 A.2d 1015, 1019 (Pa. Super. 2009) (internal citations and quotation marks omitted). Thomas first argues that the District Attorney improperly expressed his personal opinion to the jury:

> Then, you know, he claims he really doesn't remember anything is his position. Again, I asked, you know, the doctor. There's no way to prove or disprove that. You can't prove that somebody has or has not a memory. And what's that mean? This can be a statement of convenience. The Defendant decided I better just say I'm drunk and I don't remember anything, that the easiest thing for me to do, that's the most plausible thing for me to do, that's the easiest way for me to be able to escape having to face this and talk about it, because I don't have a memory.

N.T. Jury Trial, 8/16/18, at 55. Defense counsel made no objection and failed to raise this issue in post-trial motions. Accordingly, Thomas has waived any challenge thereto. ***See Commonwealth v. Ali***, 10 A.3d 282 (Pa. 2010) (stating failure to raise objection to prosecutor's comment at trial waives claim of error arising from comment). ***See also*** Pa.R.Crim.P. 720(B)(1)(a) ("All

requests for relief from the trial court shall be stated with specificity and particularity[.]").

Next, Thomas claims the District Attorney "all but accused [defense] counsel of coaching [him] to lie under oath to avoid conviction[.]" Thomas challenges the following commentary:

> How about finally, you know—how about the Defendant? He took the stand. Cool, calm and collect[ed]; no emotion, emotionless, like [a] statue; not remorseful; not sorrowful; had no emotion; answered the questions a calm, level affect, not up, not down. Is that what you expect from somebody who killed [their] friend? Is that what you expect [from] somebody on trial? Is that how you expect him to respond? I argue to you that that's the testimony of a highly coached witness whose goal to come in here, not get upset, not get [f]razzled, don't let that District Attorney [f]razzle you, get you emotional, just play it cool, tell the jury you don't remember, I'm going to go in there and tell the jury I don't remember, I was drunk.

N.T. Jury Trial, 8/16/18, at 64-65. Defense counsel did object, *id.* at 65, and the court stated it would give a curative instruction, which it did. *Id.* at 66, 91. Thomas did not seek a mistrial or include this claim in his post-sentence motion. Accordingly, we find it waived. *Commonwealth v. Brown*, 134 A.3d 1097, 1107 (Pa. Super. 2016) (holding where counsel for defendant objects during prosecutor's closing statement, the objection is sustained, and the defendant does not request mistrial, issue is waived for review). *See also* Pa.R.Crim.P. 720(B)(1)(a). Even had the issue been preserved, it is meritless.

"A prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present [his] arguments with logical force and

vigor. The prosecutor is also permitted to respond to defense arguments." *Commonwealth v. Rolan*, 964 A.2d 398, 410 (Pa. Super. 2008) (quoting *Commonwealth v. May*, 898 A.2d 559, 567 (Pa. 2006)); *see also Commonwealth v. Solomon*, 25 A.3d 380, 384 (Pa. Super. 2011). Here, the District Attorney's comments were an assessment of Thomas's demeanor on the witness stand, fair response to the defense theory of intoxication, and argument to support the prosecution's theory that this was an intentional killing. *Rolan*, *supra*. Thomas was not denied a fair trial. *Judy*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/11/2019