J-S54017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CLIFTON KELVIN HUNTER | : | |
| | : | |
| Appellant | : | No. 681 MDA 2020 |

Appeal from the Judgment of Sentence Entered January 2, 2020
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000105-2019

BEFORE: NICHOLS, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED APRIL 09, 2021**

Clifton Kelvin Hunter appeals from the judgment of sentence entered following his convictions for one count each of Attempted Homicide, Conspiracy, and Firearms not to be Carried Without a License, and two counts of Robbery.[1] Hunter challenges the weight of the evidence. We affirm on the basis of the trial court opinion.

The trial court reviews the evidence at length in its opinion; we offer a summary here. *See* Pa.R.A.P. 1925(a) Op. ("1925(a) Op."), filed 6/26/20, at 1-6. This case arises from an incident in which three men came to a home looking for money, and during the incident, a man was shot in the abdomen. Hunter was convicted of the aforementioned charges after a jury trial during which the jury was entrusted to decide whether Hunter or his associate, Jamel

---

[1] 18 Pa.C.S.A. §§ 901(a), 2501(a), 903(a), 6106(a)(1), and 3701(a)(1)(i), respectively.

Nesmith ("Nesmith"), was the shooter. After initially telling police at the scene that "Jamal Newman" shot him, the victim ultimately identified Nesmith as having been involved in the incident but said he was not the shooter. Rather, he stated Nesmith had ordered Hunter to shoot him, and Hunter complied. The victim testified at trial that he had given police the name "Jamal Newman" because he did not remember the names of the other two men and he only knew "Jamal." He also testified that a Facebook post in which he said Nesmith shot him was a lie. The jury credited the victim's testimony and found Hunter guilty of the aforementioned charges.

The trial court sentenced Hunter to an aggregate term of 27½ to 67 years' incarceration. Hunter filed a post-sentence motion challenging the weight of the evidence and his sentence. The trial court denied the motion and this timely appeal followed. Hunter raises a single issue: "Did the trial court err and abuse its discretion in not overturning the verdict after trial as it was against the weight of the evidence?" Hunter's Br. at 6.

Our review of a challenge to the weight of the evidence is limited to reviewing the trial court's exercise of discretion. *Commonwealth v. Knox*, 50 A.3d 732, 738 (Pa.Super. 2012). When reviewing a claim challenging the weight of evidence, the trial court must determine whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000) (quoting *Thompson v. City of Philadelphia*, 493 A.2d 669, 674 (Pa. 1985)). "A new

- 2 -

trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.*

Hunter maintains that "[there] exists in this matter conflict over who shot [the victim] from the varied statements of [the victim] himself." Hunter's Br. at 14. Hunter's argument essentially challenges the credibility of the victim.

"[I]t is well settled that we cannot substitute our judgment for that of the trier of fact." *Commonwealth v. Manley*, 985 A.2d 256, 262 (Pa.Super. 2009). The trial court concluded that the verdict was not against the weight of the evidence. It acknowledged that "[q]uestions about inconsistent testimony go to the credibility of the witnesses, and it is solely for the jury to resolve any conflicts or inconsistencies." 1925(a) Op. at 8 (citing *Commonwealth v. Upshur*, 764 A.2d 69, 74 (Pa.Super. 2000) (*en banc*)). Therefore, in the instant case, "it was solely for the jury to decide whether to believe the testimony of [the victim]." *Id.* at 9. The trial court also made note that the victim explained why he did not initially identify Hunter as the person who shot him. The trial court stated that other evidence also supported the victim's recount of what happened on the night of the incident, including Nesmith's testimony, a Facebook message, and a video showing Hunter along with his codefendants fleeing the scene shortly after the victim was shot. *Id.* at 10.

In the present case, testimony from police witnesses established that [the victim] told officers at the crime scene three individuals came to the residence looking for money and one person shot him. [The victim] also told police at the hospital that three people came to the house looking for money and he was shot. Furthermore, [the victim] picked [Hunter] out of a photo array within days of the incident as the person who shot him.

[The victim] testified at trial that he was contacted by Jamel Nesmith to buy some pounds of weed. Later that evening, Nesmith showed up with [Hunter] and Jackson. When [the victim] stated he was dry, Jackson accused him of lying and started searching the residence looking for weed. [Hunter] asked [the victim] who he was texting and Nesmith told [Hunter] to shoot him. [The victim] identified [Hunter] as the person who then shot him. After shooting [the victim] in the abdomen, [Hunter] pointed the gun at [the victim's] head before fleeing when he saw [Jose] Aponte with a gun.

 . . . [The victim] explained at trial why he initially did not identify [Hunter] as the shooter. He also stated the Facebook post was a lie. . . .

[The victim's testimony] was also corroborated by Nesmith. Police testified that when Nesmith was arrested three days after the incident, he identified [Hunter] and Jackson as the two other individuals involved. Based on Nesmith's information police compiled a photo array, at which time [the victim] picked out [Hunter] as the shooter. Nesmith then testified that [Hunter] arrived in a vehicle, Nesmith got into [Hunter's] car, and they drove to Jose [Aponte's] house. When [the victim] stated he did not have any weed, Jackson asked [the victim] where the money was located. [Hunter] told [the victim] to get off his phone, he walked up to [the victim] to grab the phone, and reached into his hoodie. Nesmith then saw [Hunter] pull something out and heard a gunshot.

Nesmith's testimony was corroborated by a Facebook message dated October 16, 2018, showing that Nesmith did in fact contact [the victim] at 6:31 p.m. Nesmith was further corroborated by a video showing three individuals walking towards [the victim's] apartment just as Nesmith had

described, and Nesmith identified the individuals as [Hunter], Jackson, and himself.

*Id.* at 9-10.

After a review of the parties' briefs, the record, the applicable law, and the trial court's opinion, we find no abuse of discretion in the trial court's rejection of Hunter's weight claim. ***See id.*** at 7-10. We therefore affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 04/09/2021

Circulated 03/08/2021 02:45 PM

June 29, 2020

Re: Clifton K. Hunter
Cp Cr No: 105-2019
Superior Cr No: 681 MDA 2020

Index of Opinion

1. Index of Opinion
2. Opinion

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**CRIMINAL**

COMMONWEALTH OF PENNSYLVANIA :
                                                :    No. 681 MDA 2020

vs.                                    :

                                               :    CP-36-CR-0000105-2019

CLIFTON KELVIN HUNTER            :

### PA. R.A.P. 1925 OPINION

BY TOTARO, J.

Presently before the Superior Court of Pennsylvania is an appeal filed by Clifton Kelvin Hunter ("Appellant") from the judgment of sentence imposed on January 2, 2020, as finalized by the denial of a post-sentence motion on April 29, 2020. For the reasons stated herein, the appeal should be denied.

### BACKGROUND

On October 16, 2018, Lancaster City Bureau of Police ("LCBP") responded to 3 South Lime Street in Lancaster City for a reported shooting and found Hilary Gbotoe ("Gbotoe") suffering from a gunshot wound to the abdomen. *See* Police Criminal Complaint and Affidavit of Probable Cause. Gbotoe was transported to a hospital where he received emergency life-saving surgery for his wound. *Id.* Gbotoe later told police that he was staying with a friend named Jose Aponte ("Aponte") when three males came to the residence to collect $10,000. *Id.* Gbotoe identified the suspects as Appellant, Jovar Jackson ("Jackson"), and Jamel Nesmith ("Nesmith"). *Id.* Gbotoe stated that he, Aponte, and the residence were searched but no money was found. *Id.* Appellant then shot Gbotoe in the abdomen and the suspects fled. *Id.* On October 20, 2018, police obtained a warrant for Appellant's arrest. *See* Arrest Warrant.

A criminal information was filed charging Appellant with (count 1): attempted homicide; (count 2): conspiracy to commit homicide; (count 3): aggravated assault; (count 4): conspiracy to commit aggravated assault; (count 5): robbery; (count 6): robbery; (count 7): conspiracy to commit robbery; (count 8): firearms not to be carried without a license; and (count 9): possession of firearm prohibited.[1] *See* Information.

The case proceeded to a consolidated trial against Appellant and Jackson on October 9, 2019. (Notes of Testimony at 12-13) ("N.T.").[2] Officer J. Hatfield ("Hatfield"), LCBP, testified that on October 16, 2018, at 7:42 p.m., he was dispatched to 3 South Lime Street in Lancaster for a possible shooting. *Id.* at 404. Upon arrival, Hatfield heard someone moaning inside, found the door was locked, and knocked on the door. *Id.* at 405, 419. When there was no answer, Hatfield forced entry into the apartment. *Id.* at 405. Once inside, Hatfield saw a male standing near the door and another male laying on the floor who stated he was shot. *Id.* at 406-07.

Officer Timothy Sinnott ("Sinnott"), LCBP, testified that when he responded to the scene he saw Hatfield kick open the door and Aponte standing inside near the door. (N.T. at 432-34, 449-50). Aponte was removed from the residence. *Id.* Sinnott saw Gbotoe laying on the ground in extreme pain and observed a gunshot wound to Gbotoe's abdomen. *Id.* at 435, 447. When Sinnott asked who shot him, Gbotoe said Jamal Newman ("Newman") and two other subjects came to the residence, they said he owed them money, and Newman shot him. *Id.* at 436-38. Gbotoe did not know the names of the two other people but knew them from school. *Id.* at 438.

---

[1] 18 Pa.C.S.A. § 901(a); 18 Pa.C.S.A. § 903(a); 18 Pa.C.S.A. § 2702(a)(1); 18 Pa.C.S.A. § 3701(a)(1)(i)(ii); 18 Pa.C.S.A. § 6106(a); and 18 Pa.C.S.A. § 6105(a)(1).

[2] The Commonwealth did not attach counts 2, 3, 4, and 9 for trial, and the Information was amended so the robbery victim at count 5 was Gbote and the count 6 victim was Aponte. (N.T. at 78-80).

Detective Robert Whiteford ("Whiteford"), LCBP, testified that he created a photo array containing a picture of Newman and took it to the hospital, but Gbotoe did not identify the suspect. (N.T. at 608-12). However, Gbotoe recalled a conversation on Facebook with Jamal prior to the robbery, so Whiteford searched Gbotoe's Facebook profile of friends and located a person named Jamel Nesmith. *Id.* at 613-14, 624. Whiteford then created a photo array with the photograph of Nesmith and Gbotoe immediately identified Nesmith as the person involved. *Id.* at 614. Gbotoe told Whiteford that the three people involved searched Aponte, Gbotoe, and the apartment looking for $10,000. *Id.* at 625-29. Gbotoe also told Whiteford that Nesmith was not the shooter, but he ordered another suspect to shoot him. *Id.* at 625, 629-30.

Gbotoe testified that he was staying with Jose Aponte at 3 South Lime Street in Lancaster when he was contacted by a friend named Jamel Nesmith who wanted to buy "some pounds of weed." (N.T. at 249-52). Later that evening, Nesmith showed up at the residence with Appellant and Jackson. *Id.* at 252-54. When they entered the residence, Nesmith asked about the weed and Gbotoe stated he was dry. *Id.* at 255. Jackson accused Gbotoe of lying and started searching the residence looking for weed. *Id.* at 255-56. Gbotoe stated that while he was texting on his phone, Appellant asked who he was texting and Nesmith said to shoot him. *Id.* at 256-58. Appellant pulled a gun out of his waistband and shot Gbotoe in the abdomen. *Id.* at 258.

Appellant then pointed the gun at Gbotoe's head. (N.T. at 258). However, Appellant took off running when Jackson yelled that Aponte had a gun. *Id.* at 258-59, 261. Gbotoe testified that when police arrived he gave the name of Jamal Newman as the shooter because he could not remember the names of the other two persons involved. *Id.* at 263. The only name he knew was Jamal. *Id.* at 264-66. Gbotoe said he later gave police more detailed information

3

stating that Jamal was not the shooter and he forgot Jamal's last name. *Id.* at 265-66. From photo arrays, Gbotoe then identified Jamel Nesmith as the person he knew to be Jamal, Jovar Jackson as the non-shooter, and Appellant as the person who shot him. *Id.* at 266-71.[3]

Detective Thomas Ginder ("Ginder"), LCBP, testified that he apprehended Nesmith on October 19, 2018. (N.T. at 647). During an interview at the police station, Nesmith was visibly upset and crying. *Id.* Nesmith identified the two other individuals involved and police compiled photo arrays of those individuals to show Gbotoe at the hospital. *Id.* at 648. Ginder stated that Gbotoe picked out photographs of Appellant and Jackson as those involved, while identifying Appellant as the shooter. *Id.* at 648-52. Ginder further related that Nesmith informed police Appellant drove a blue Crown Victoria. *Id.* at 652-53. Detective Eric McCrady, LCBP, testified that six days after the shooting police found Appellant's vehicle parked in the 200 block of North Marshall Street in Lancaster City. *Id.* at 633-35, 639. Police set up surveillance and towed the car to the police station when no one returned for the vehicle. *Id.* at 635-36.

Nesmith testified that he knew Appellant, Jackson, and Gbotoe. (N.T. at 122-25). On October 16, 2018, Nesmith contacted Gbotoe to buy a quarter pound of weed. *Id.* at 125, 128, 130.[4] Gbotoe responded that he did not have the whole amount, but he was going to check with Jose and would be back in touch. *Id.* at 130. Jackson was present as Nesmith attempted to set up

---

[3] On cross-examination, Gbotoe acknowledged writing in a Facebook post on November 7, 2018 that Jamel shot him, but stated the post was a lie. (N.T. at 298-301). Gbotoe admitted he was a drug dealer for profit. *Id.* at 302. Gbotoe also stated he was currently facing a charge of criminal trespass which occurred on August 27, 2018, and possession of a firearm which occurred on January 19, 2019, for which the Commonwealth had not offered him any consideration in exchange for his cooperation as a victim in this case. *Id.* at 292-94. In fact, Gbotoe was currently incarcerated on the other criminal charges when he testified at trial and had been incarcerated for the past eight months. *Id.* at 305-06.

[4] The Commonwealth introduced as Exhibit #1 a Facebook message dated October 16, 2018, showing Nesmith contacting Gbotoe at 6:31 p.m. (N.T. at 129).

4

the drug deal and Appellant arrived shortly thereafter in a vehicle. *Id.* at 130-31. Nesmith stated that he and Jackson then got into Appellant's car and they drove to Jose's house to see if he could get the marijuana. *Id.* at 134.[5] They parked in an alleyway, walked to the house, and Jackson knocked on the door. *Id.* at 136-37.[6] Upon entering the residence, Nesmith saw Gbotoe sitting in a chair on his phone and Jose was standing in the kitchen. *Id.* at 141-42.

Nesmith further related that when Gbotoe stated he did not have the weed Jackson asked Gbotoe where the money was located. (N.T. at 142-45, 185). Appellant then told Gbotoe to get off his phone and Gbotoe responded by saying he was texting somebody to try and make a drop. *Id.* at 145. Appellant walked up to Gbotoe to grab the phone, Gbotoe moved the phone away, Appellant reached into his hoodie, and Nesmith saw Appellant pull something out. *Id.* at 145-46. Nesmith did not see the gun, but he instantly heard a gunshot and took off out the door. *Id.* at 146. Nesmith stated he was arrested on October 19, 2018, and was taken to the police station. *Id.* at 152. While there, Nesmith identified Appellant and Jackson as the two individuals he was with during the incident, specifically identifying Appellant as the shooter. *Id.* at 154-57.

Sergeant Thomas Cole ("Cole"), LCBP, testified that he responded to the scene and found Aponte sitting outside on a cement slab. (N.T. at 468). Several small baggies containing white

---

[5] Nesmith testified that he did not intend to rob Gbotoe when he went to the house, but rather wanted to buy weed so he could re-sell it. (N.T. at 169, 180). Nevertheless, Nesmith was charged with two counts of robbery, aggravated assault, conspiracy to commit aggravated assault, and attempted homicide. *Id.* at 169-70, 198-99. Nesmith stated no promises had been made to him in return for his testimony and he acknowledged a retail theft conviction from 2015. *Id.* at 157, 171.

[6] Detective Ginder testified that he retrieved video from cameras in the area and produced still shots. (N.T. at 653-54). The Commonwealth introduced as Exhibit #3 a photograph showing three individuals walking towards Jose's house, and Nesmith identified them as Appellant, Jackson, and himself. *Id.* at 138-39. They arrived in the area at 7:35 p.m, the shooting was reported at 7:42 p.m, and two individuals are shown leaving the scene in different directions at 7:42 p.m. *Id.* at 655-57, 661-66.

5

pills later determined to be Alprazolam were found outside. *Id.* at 469. Empty baggies matching the ones found outside were also located on the kitchen table. *Id.* at 470.

Michael Bradley ("Bradley"), an evidence specialist for LCBP, responded to the crime scene. (N.T. at 516, 521). Bradley stated he located drugs just outside the front door which caused him to suspect a robbery had occurred. *Id.* at 522, 525, 582-83. He also recovered a revolver centered toward the top of the bed in the bedroom. *Id.* at 526-28. Bradley determined the gun was inoperable because it was missing a trigger, trigger guard, firing pin, and hammer. *Id.* at 530-32, 586. No missing pieces to the firearm were found at the crime scene. *Id.* at 588.

Dr. John Lee ("Lee") testified that Gbotoe sustained five separate areas of injury to his small intestine. (N.T. at 596). Three damaged areas were removed because they were beyond repair. *Id.* As such, Gbotoe is at risk of complications such as intestinal blockage for the rest of his life. *Id.* at 601. The bullet was not removed because the final location was buried deep behind Gbotoe's abdomen and it was not a safe procedure. *Id.* at 601-02. Gbotoe suffered a life-threatening injury and "most certainly would have died" without the surgery. *Id.* at 595-96.

United States Deputy Marshal Rob Miller ("Miller") testified that LCBP requested his assistance in attempting to locate Appellant in Rhode Island. (N.T. at 508-10). On October 26, 2018, Miller apprehended Appellant in Rhode Island without incident. *Id.* at 511-13. Appellant did not have a license to carry a firearm. *Id.* at 667-68.

On October 16, 2019, Appellant was found guilty on all counts and a pre-sentence investigation ("PSI") report was ordered. (N.T. at 955-71, 973). On January 2, 2020, the court imposed the following sentence on (count 1) attempted homicide: 18-40 years incarceration in the state correctional institution ("SCI"); (count 5) robbery: 10-20 years in SCI, concurrent to

6

count one; (count 6) robbery: 10-20 years in SCI, concurrent to counts one and five; (count 7) conspiracy to commit robbery: 6-20 years in SCI, consecutive to count one; and (count 8) firearms not to be carried without a license: 3½ to 7 years in SCI, consecutive to count seven. (Notes of Testimony, Sentencing at 17-18) ("N.T.S."). The aggregate sentence was 27½ to 67 years in SCI, and Appellant was made eligible for any programs in SCI to address his addiction and/or mental health issues. *Id.* at 18-19.

On March 25, 2020, Appellant filed a post-sentence motion challenging the weight of the evidence and the sentence imposed. *See* Post-Sentence Motion *Nunc Pro Tunc*. The motion was denied on April 29, 2020. *See* Order, 4/29/20.

On April 30, 2020, Appellant filed a Notice of Appeal. A Concise Statement of Errors Complained of on Appeal ("Statement") was filed on May 22, 2020, asserting that: (1) the trial court erred and abused its discretion in not overturning the verdict after trial on counts 1, 5, 6, and 7 because it was against the weight of the evidence; (2) the trial court erred in not overturning the verdict after trial on counts 7 and 8 because there was insufficient evidence to support the convictions; (3) the sentence imposed was an abuse of discretion; and (4) the trial court erred when it declined to give a missing witness adverse inference jury instruction regarding the Commonwealth's failure to call Aponte at trial. *See* Statement. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## DISCUSSION

### 1. The verdict was not against the weight of the evidence.

Appellant claims the court erred and abused its discretion in not overturning the verdict on counts 1, 5, 6, and 7, because it was against the weight of the evidence. *See* Statement.

7

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court, which will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013). "[T]he evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015) (quoting *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003)).

"A trial judge cannot grant a new trial merely because of some conflict in testimony or because the judge would reach a different conclusion on the same facts. . . ." *Commonwealth v. Blakeney*, 946 A.2d 645, 653 (Pa. 2008). The jury is free to believe "all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Smith*, 985 A.2d 886, 897 (Pa. 2009). Questions about inconsistent testimony go to the credibility of the witnesses, and it is solely for the jury to resolve any conflicts or inconsistencies. *Commonwealth v. Upshur*, 764 A.2d 69, 74 (Pa. Super. 2000).

In *Upshur,* the appellant claimed the jury's verdict finding him guilty of murder of the first degree was against the weight of the evidence because the only eyewitness to the crime had given conflicting accounts of the incident in statements to the police and during trial, which made his testimony "wholly unworthy of belief." 764 A.2d at 72. The Superior Court disagreed, stating it was solely for the jury to determine credibility of the witnesses and resolve conflicts or inconsistencies in the evidence. *Id.* at 74. The verdict was not against the weight of the evidence because the jury determined the testimony of the Commonwealth witness was credible. *Id.*

A trial court's exercise of discretion in determining whether a verdict is against the weight of the evidence is one of the "least assailable reasons for granting or denying a new trial."

8

*Commonwealth v. Dupre,* 866 A.2d 1089, 1102 (Pa. Super. 2005). Appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. *Smith,* 985 A.2d at 897. The function of an appellate court is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider de novo the underlying question of the weight of the evidence. *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009).

In the present case, testimony from police witnesses established that Gbotoe told officers at the crime scene three individuals came to the residence looking for money and one person shot him. Gbotoe also told police at the hospital that three people came to the house looking for money and he was shot. Furthermore, Gbotoe picked Appellant out of a photo array within days of the incident as the person who shot him.

Gbotoe testified at trial that he was contacted by Jamel Nesmith to buy some pounds of weed. Later that evening, Nesmith showed up with Appellant and Jackson. When Gbotoe stated he was dry, Jackson accused him of lying and started searching the residence looking for weed. Appellant asked Gbotoe who he was texting and Nesmith told Appellant to shoot him. Gbote identified Appellant as the person who then shot him. After shooting Gbotoe in the abdomen, Appellant pointed the gun at Gbotoe's head before fleeing when he saw Aponte with a gun.

In arguing the verdict was against the weight of the evidence, Appellant noted that Gbote identified Jamaal Newman as the shooter at the crime scene, in the hospital, and in a later Facebook post. *See* Post-Sentence Motion *Nunc Pro Tunc*. However, Gbotoe explained at trial why he initially did not identify Appellant as the shooter. He also stated the Facebook post was a lie. As in *Upshur*, it was solely for the jury to decide whether to believe the testimony of Gbotoe.

9

Gbotoe was also corroborated by Nesmith. Police testified that when Nesmith was arrested three days after the incident, he identified Appellant and Jackson as the two other individuals involved. Based on Nesmith's information police compiled a photo array, at which time Gbotoe picked out Appellant as the shooter. Nesmith then testified that Appellant arrived in a vehicle, Nesmith got into Appellant's car, and they drove to Jose's house. When Gbotoe stated he did not have any weed, Jackson asked Gbotoe where the money was located. Appellant told Gbotoe to get off his phone, he walked up to Gbotoe to grab the phone, and reached into his hoodie. Nesmith then saw Appellant pull something out and heard a gunshot.

Nesmith's testimony was corroborated by a Facebook message dated October 16, 2018, showing that Nesmith did in fact contact Gbotoe at 6:31 p.m. Nesmith was further corroborated by a video showing three individuals walking towards Gbotoe's apartment just as Nesmith had described, and Nesmith identified the individuals as Appellant, Jackson, and himself. Nesmith told police that Appellant drove a blue Crown Victoria, and police found Appellant's vehicle parked in Lancaster City. They towed the car to the police station when Appellant did not return for the vehicle. On October 26, 2018, Appellant was apprehended in Rhode Island, which the Commonwealth argued showed Appellant's consciousness of guilt based on flight.[7]

The jury's verdict was not so contrary to the evidence as to shock one's sense of justice, nor was it against the weight of the evidence. Therefore, Appellant's claim must fail.

---

[7] Officer Joshua Aziza, LCBP, testified that on January 6, 2019, Jackson fled from a vehicle at a traffic stop for a heavy window tint violation. (N.T. at 734-36). Detective Nathan Nickel, LCBP, testified that on March 8, 2019, he went to the front door of a residence where Jackson was believed to be located and Jackson fled out the rear door. *Id.* at 739-40. After jumping fences, Jackson ran into a blocked foot alley where he was taken into custody. *Id.* at 740-41. This evidence of flight on the part of Jackson further corroborated the testimony of Gbotoe and Nesmith in identifying Appellant and Jackson as two of the individuals involved in the incident.

10

**2.** **The evidence was sufficient to convict Appellant on counts 7 and 8.**

Appellant claims the court erred in not overturning the verdict on counts 7 and 8 because there was insufficient evidence to support the convictions. *See* Statement. However, a 1925(b) Statement must specify the element or elements on which the evidence was insufficient to preserve such a claim. *Commonwealth v. Hoffman*, 198 A.3d 1112, 1125 (Pa. Super. 2018). Because Appellant has failed to satisfy this requirement the issue should be deemed waived.

If the claim is not waived, a challenge to the sufficiency of the evidence is a question of law. *Commonwealth v. Heater*, 899 A.2d 1126, 1131 (Pa. Super. 2006). When reviewing a sufficiency of the evidence claim, appellate courts are governed by the following principles:

> [The] standard [for] reviewing the sufficiency of the evidence is whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. [The Court] may not weigh the evidence or substitute [its] judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part, or none of the evidence. For purposes of [the Court's] review under these principles, [the Court] must review the entire record and consider all of the evidence introduced.

*Commonwealth v. Love*, 896 A.2d 1277, 1283 (Pa. Super. 2006) (internal quotations and citations omitted). The Commonwealth may sustain its burden of proof wholly by circumstantial evidence, as long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011).

On count 7, Appellant was convicted of conspiracy to commit robbery. To convict a defendant of conspiracy pursuant to 18 Pa.C.S.A. § 903, the Commonwealth must prove beyond

11

a reasonable doubt that "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a 'co-conspirator') to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Commonwealth v. Murphy*, 844 A.2d 1228, 1238 (Pa. 2004). Because direct evidence of a defendant's criminal intent or the conspiratorial agreement is rarely available, "the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by 'the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators.'" *Id.* (quoting *Commonwealth v. Spotz*, 716 A.2d 580, 592 (Pa. 1998)).

A person is guilty of robbery if, in the course of committing a theft, he inflicts serious bodily injury upon another or threatens another with or intentionally puts another in fear of immediate serious bodily injury. 18 Pa.C.S.A. § 3701(a)(1)(i)(ii). Circumstantial evidence may warrant the conclusion that an assault was for the purpose of taking money from the victim and anyone else at the scene. *Commonwealth v. Reed*, 326 A.2d 356, 358 (Pa. Super. 1974). A victim's identification of the defendant as a perpetrator in a robbery is alone sufficient to sustain a robbery conviction. *Commonwealth v. Johnson*, 180 A.3d 474, 478 (Pa. Super. 2018).

For conspiracy to commit robbery, the testimony of a victim regarding the behavior of a defendant and his cohorts during a robbery is "sufficient to show a shared intent and implicit agreement to commit a robbery, as well as multiple overt acts perpetrated in furtherance of that conspiracy." *Johnson*, 180 A.3d at 482. In *Commonwealth v. Esposito*, 344 A.2d 655 (Pa. Super. 1975), where there was no direct evidence of an unlawful agreement, the Superior Court held that an agreement to rob a store could be inferred from the conduct of the defendants. *Id.* at

12

657. Moreover, evidence which showed that a defendant acted in concert with another when they broke into the victim's home and engaged in criminal activity was sufficient to establish that the defendant was part of a conspiracy to rob the victim. *Commonwealth v. Ruffin*, 463 A.2d 1117, 1119 (Pa. Super. 1983).

The evidence introduced at trial and all reasonable inferences derived therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, was sufficient to prove beyond a reasonable doubt that Appellant was guilty of conspiracy to commit robbery. Gbotoe told officers that three individuals came to the residence claiming he owed them money. Those persons searched him, Aponte, and the apartment looking for $10,000. When Nesmith asked about the pounds and Gbotoe said he was dry, Jackson started searching for weed. Appellant then asked Gbotoe who he was texting, Nesmith said to shoot him, and Appellant shot Gbotoe in the abdomen. Gbotoe's testimony alone was sufficient to show a shared intent and implicit agreement on the part of Appellant and his co-conspirators to commit a robbery.

Nesmith testified that when Gbotoe stated he did not have any weed, Jackson asked Gbotoe where the money was located, Appellant told Gbotoe to get off his phone, Appellant walked up to Gbotoe to grab the phone, Appellant reached into his hoodie when Gbotoe moved the phone away, and Nesmith then heard a gunshot. Evidence specialist Michael Bradley also located drugs just outside the front door which caused him to suspect a robbery had occurred. While Nesmith claimed he did not go to Gbotoe's residence with the intent to commit a robbery, the jury was free to disregard that testimony as self-serving. Even if true, Nesmith's testimony was sufficient to show that Appellant and Jackson had a shared intent and an implicit agreement to steal drugs and/or money from Gbotoe and Aponte. Thus, this claim must fail.

13

On count 8, Appellant was convicted of firearms not to be carried without a license. The relevant section of this statute is defined as follows:

> **(a) Offense defined.--**
> (1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S.A. §6106(a).

The evidence introduced at trial and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to prove beyond a reasonable doubt that Appellant was guilty of firearms not to be carried without a license. Gbotoe testified he saw Appellant pull a gun out of his waistband. Nesmith also stated that Appellant reached into his hoodie and pulled something out just before Nesmith heard a gunshot. Furthermore, Detective Ginder testified that Appellant did not have a license to carry a firearm. Because the evidence showed that Appellant carried a firearm concealed on or about his person without a valid and lawfully issued license, this claim must fail.

**3.     The trial court did not abuse its discretion when imposing sentence.**

Appellant next asserts the trial court abused its discretion by imposing an aggregate sentence of 27½ to 67 years incarceration, claiming it was unduly harsh and failed to consider his young age, ability to rehabilitate, and rehabilitative needs. *See* Statement.

An appellant's right to appeal the discretionary aspects of his sentence is not absolute. *Commonwealth v. Fiascki*, 886 A.2d 261, 263 (Pa. Super. 2005). Before such a challenge will be heard the appellant must show there is "a substantial question that the sentence imposed is not

14

appropriate under the Sentencing Code." *Id*. at 263; 42 Pa.C.S.A. § 9781(b). To establish a substantial question, an appellant must show that the actions taken by the sentencing court are inconsistent with the sentencing code or contrary to the fundamental norms that underlie the sentencing process. *Fiascki*, 886 A.2d at 263. A bald allegation of excessiveness will not suffice to establish a substantial question. *Id*. Moreover, a trial court's exercise of discretion in imposing consecutive as opposed to concurrent sentences is generally not viewed as raising a substantial question that would allow the granting of allowance of appeal. *Commonwealth v. Mastromarino*, 2 A.3d 581, 586 (Pa. Super. 2010). A bald claim of excessiveness due to consecutive sentences within the standard range of the guidelines will not raise a substantial question unless the application of the guidelines would be clearly unreasonable resulting in an excessive sentence. *Commonwealth v. Diehl*, 140 A.3d 34, 45 (Pa. Super. 2016).

In this case, Appellant's bald allegations do not raise a substantial question because the court had the benefit of a PSI and considered Appellant's entire background and rehabilitative needs in fashioning an appropriate sentence.[8] Assuming, *arguendo*, Appellant has presented a substantial question, the court must consider a defendant's age, character, personal characteristics, prior criminal record, circumstances of the offense, and potential for

---

[8] Appellant acknowledges the sentences imposed were within the standard range of the sentencing guidelines. *See* Post Sentence Motion *Nunc Pro Tunc*. Nevertheless, Appellant claims the consecutive sentences were excessive given the charges and Appellant's "limited role in the incident, as he was not the shooter." *Id*. Appellant is mistaken because he was the shooter and the court recognized the serious nature of the crimes. Appellant baldly claims in his post-sentence motion and Statement that the court did not give proper consideration to his rehabilitative needs, ability to rehabilitate, and educational level. However, the record shows otherwise. (N.T.S. at 13-15). Appellant claims the court did not give proper consideration to his young age, but once again the record shows otherwise. *Id*. at 13. Appellant also claims the court did not consider the possibility that his prefrontal cortex was not fully developed at the time of this offense, but speculation about the development of his prefrontal cortex was outweighed by other factors the court properly considered before imposing sentence.

rehabilitation in determining an appropriate sentence. *Commonwealth v. Clemat*, 218 A.3d 944,

959 (Pa. Super. 2019). The goal of the sentencing code is to ensure that the sentence imposed

should call for confinement consistent with protection of the public, the gravity of the offense as

it relates to impact on the life of the victim and community, and rehabilitative needs of the

defendant. *Commonwealth v. Mouzon,* 812 A.2d 617, 620 (Pa. 2002); 42 Pa.C.S.A. § 9721(b).

The general standard of review when considering a challenge to the discretionary aspects

of a court's sentence has been established by the Superior Court as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Griffin*, 65 A.3d 932, 937 (Pa. Super. 2013). In discussing the rationale

behind such broad discretion to the sentencing court and the deferential standard of appellate

review, the Pennsylvania Supreme Court has stated:

> [T]he sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. . . . Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court.

*Commonwealth v. Walls*, 926 A.2d 957, 961-62 (Pa. 2007); *see also Commonwealth v. Jones*,

613 A.2d 587, 591 (Pa. Super. 1992) (sentencing court is in better position to view a defendant's

character, display of remorse, defiance or indifference, and effect and nature of the crime).

16

The appellate court should affirm the trial court's sentence unless it finds that the guidelines were erroneously applied, a guideline sentence is "clearly unreasonable," or a sentence outside the guidelines is "unreasonable." *Fiascki,* 886 A.2d at 263; 42 Pa.C.S.A. § 9781(c). To determine if a sentence is unreasonable, Appellate courts must consider the circumstances of the offense, background and character of the defendant, opportunity of the trial court to observe the defendant, the trial court's review of a presentence investigation, findings upon which the sentence was based, and sentencing guidelines. *Commonwealth v. Moore*, 617 A.2d 8, 12 (Pa. Super. 1992); 42 Pa.C.S.A. § 9781(d). In *Walls,* the Supreme Court did not define unreasonableness but stated "we are confident that rejection of a sentencing court's imposition of sentence on unreasonableness grounds would occur infrequently . . ." 926 A.2d at 964.

The sentencing court also has discretion to impose sentences concurrent or consecutive to other sentences being imposed at the same time. *Commonwealth v. Johnson-Daniels,* 167 A.3d 17, 28 (Pa. Super. 2017). When the court relies on a defendant's prior criminal history and finds the defendant is a high risk to re-offend and a danger to the public, consecutive standard range sentences are not clearly unreasonable. *See Commonwealth v. Klueber*, 904 A.2d 911 (Pa. 2006).

Finally, when the sentencing court takes into consideration information contained within a pre-sentence investigation report, the Superior Court has noted:

> Since the sentencing court had and considered a presentence report, this fact alone was adequate to support the sentence, and due to the court's explicit reliance on that report, we are required to presume that the court properly weighed the mitigating factors present in the case. . . where the sentencing judge had the benefit of a presentence investigation report, it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

*Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. 2004)) (citation omitted).

17

In the present case, the court relied heavily on all information contained in the PSI report before imposing sentence, including Appellant's character, family history, and rehabilitative needs. (N.T.S. at 11-13). Thus, pursuant to *Boyer*, *supra*, there is a presumption that the court was aware of all relevant information regarding Appellant's character and weighed those considerations before imposing sentence.

Specifically, the court noted that Appellant was 24 years of age when these offenses occurred, an age of sufficient maturity to understand the significance of his acts. (N.T.S. at 13). Appellant dropped out of high school in the eleventh grade but received his GED in 2013 while incarcerated in state prison and he denied having any learning disabilities. *Id.* As such, there was nothing to indicate a lack of intellectual ability that would prevent Appellant from understanding the significance of his acts. *Id.* at 13-14. Appellant also had a work history as a cook in 2018 and as a laborer from November 2017 to April 2018. *Id.* at 14.

The court considered Appellant's mental health and substance abuse history. (N.T.S. at 12). Appellant reported he was diagnosed with bi-polar disorder when he was in juvenile placement and was on several medications, but stopped taking those medications after release from placement. *Id.* Appellant also stated that alcohol has never been a problem for him, he did not like marijuana, and he has never attended any drug or alcohol treatment programs. *Id.*

The court considered Appellant's prior criminal record starting as a juvenile. (N.T.S. at 14). In 2008, Appellant was adjudicated delinquent for the crime of simple assault. *Id.* In 2012, Appellant was convicted as an adult for the crimes of robbery and conspiracy to commit robbery, for which he received a state prison sentence of 3½ to 7 years incarceration. *Id.* This was now the third time Appellant appeared in court since 2008 for committing crimes of violence. *Id.*

18

The court considered Appellant's rehabilitative needs, finding there was nothing to indicate he had made any attempt to change his lifestyle or was amenable to rehabilitation. (N.T.S. at 14-15). Appellant was in three separate placements between 2008 and 2010 for the simple assault adjudication. *Id.* at 14. The prior robbery conviction occurred only two years later, resulting in Appellant's incarceration from January 2012 to July 2015. *Id.* at 14-15. He was also incarcerated from August 2016 to September 2017. *Id.* at 15. These new offenses occurred only one year after Appellant was released from custody on the prior robbery. *Id.*

The court considered the nature and circumstances of these crimes, and the gravity of the crimes as they relate to impact on the victim and community. (N.T.S. at 15-17). Appellant participated in an armed robbery with two co-defendants, he shot the victim in the abdomen without provocation after Appellant and his co-defendants did not find any money or drugs in the victim's apartment, the victim was critically injured and would have died if not for life-saving surgery, the bullet remains in the victim's body and cannot be removed or the victim may become paralyzed, and the victim is at risk for complications the rest of his life. *Id.*

The court considered the penalties authorized by the Pennsylvania legislature for the crimes committed, the guidelines of the Sentencing Code, and those established by the Pennsylvania Commission on Sentencing. (N.T.S. at 13). The sentences imposed on each count were within the standard range of the sentencing guidelines. *Id.* at 4-5.[9]

---

[9] With a prior record score of four, the recommended minimum sentences were (count 1) criminal attempt/homicide: 186 months to statutory limit with deadly weapon used enhancement, and mandatory minimum 10 years for second strike; (count 5) robbery inflicts serious bodily injury: 90-108 months (deadly weapon used enhancement); (count 6) robbery fear of serious bodily injury: 66-78 months (deadly weapon used enhancement); (count 7) conspiracy/robbery: 90-108 months; (count 8) firearms not to be carried without license: 36-48 months. *See* Sentencing Guidelines Worksheet.

19

Finally, the court considered the arguments of counsel, the victim impact statement, a letter from Appellant's mother, and comments made by Appellant during the sentencing proceedings. (N.T.S. at 10-13). Additionally, the court determined a sentence of confinement consistent with protection of the public. *Id.* at 17.

After considering all factors, the court found there was an undue risk that Appellant would commit another crime during a period of probation or partial confinement, he is not amenable to rehabilitation, and he is in need of correctional treatment that can be provided most effectively by his commitment to an institution. (N.T.S. at 17). Furthermore, Appellant is a danger to society, society needs to be protected, and incarceration is warranted because a lesser sentence would depreciate the seriousness of the crimes. *Id.*

Because Appellant has failed to show that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision, this claim is without merit.

**4.     The trial court did not err in declining to give a missing witness instruction.**

Finally, Appellant asserts the trial court erred when it declined to give a missing witness adverse inference jury instruction regarding the Commonwealth's failure to call Aponte at trial. *See* Statement.

During an initial charge conference, Jackson's counsel requested a missing witness instruction regarding Aponte. (N.T. at 554).[10] Appellant joined in the request. *Id.* at 557. The

---

[10] The missing witness instruction states in relevant part: "[T]here is a question about what weight, if any, you should give to the failure of the Commonwealth to call a person as a witness. If however three factors are present, and there is no satisfactory explanation for a party's failure to call a potential witness, the jury is allowed to draw a common-sense inference that his testimony would have been unfavorable to that party. The three necessary factors are: *First*, the person is available to that party

20

prosecutor was opposed, noting that both counsel knew where Aponte resided and they had as much ability as the Commonwealth to subpoena Aponte and call him as a witness. *Id.* at 555. The prosecutor also stated that officers served Aponte with a subpoena one week before trial but Aponte said he did not want to testify and "he was not coming in." *Id.* at 555-56. The officers have had no contact with Aponte since he was served with the subpoena. *Id.* at 556.[11]

Jackson's counsel suggested the Commonwealth did not provide Aponte's address in discovery and they did not know where to find him. (N.T. at 556-57). In response, the prosecutor noted counsel was aware of Aponte's address because that is where the shooting occurred. *Id.* at 557. When the court asked whether counsel could have tracked Aponte down, Appellant's counsel acknowledged, "I would imagine." *Id.* Jackson's counsel also stated "we just learned during the trial that he might be a favorable witness, so that's when we got notice that he even would - - it would be necessary or advantageous for us to know where he is." *Id.* at 558. The court deferred ruling on the matter. *Id.* at 559.

During a final charge conference, the court declined to give the instruction because it was not established that Aponte was available only to the Commonwealth and not the defense. (N.T.

---

only and not to the other; *Second*, it appears the person has special information material to the issue; and *Third*, the person's testimony would not be merely cumulative. Therefore, if you find these three factors present, and there is no satisfactory explanation for the Commonwealth's failure to call a person to testify, you may infer, if you choose to do so, that his testimony would have been unfavorable to the Commonwealth." Pa. SSJI (Crim) 3.21A (Failure to Call Potential Witness).

[11] Nesmith testified that Gbotoe was going to check with Aponte about getting drugs. (N.T. at 183-84). Gbotoe testified that Aponte was no longer talking to him because Aponte did not like snitches. *Id.* at 291-92, 338-40. Officer Cole testified that Aponte was hesitant to cooperate at the time of the shooting. *Id.* at 494. Detective Ginder testified that eyewitnesses saw Aponte go back inside and shut the door right after the shooting. *Id.* at 688. Officer Hatfield testified that Aponte would have had time to open the door before police had to kick it down. *Id.* at 419-20. Detective Ginder testified that he did subpoena Aponte to appear for trial. *Id.* at 709.

21

at 771). In fact, defense counsel made no attempt to locate or subpoena Aponte. *Id.* Appellant did not object following the court's ruling. *Id.* at 771-74. Appellant also did not object when given an opportunity at the conclusion of the final charge to the jury. *Id.* at 925.

"A specific and timely objection must be made to preserve a challenge to a particular jury instruction." *Commonwealth v. Moury*, 992 A.2d 162, 178 (Pa. Super. 2010). "Failure to do so results in waiver." *Id.* A defendant also waives a challenge to the propriety of the jury charge if he responds in the negative when the court asks whether additions or corrections to a jury charge are necessary. *Commonwealth v. Proctor*, 156 A.3d 261, 270 (Pa. Super. 2017). Where the defendant contested a jury charge at the charging conference but failed to object when prompted by the court immediately after the jury was charged, the Superior Court found that a general exception to the charge to the jury will not preserve an issue for appeal. *Commonwealth v. Cosby*, 224 A.3d 372, 421 (Pa. Super. 2019). Thus, Appellant has waived this issue because he did not make a specific and timely objection. He also responded in the negative when asked if there was anything further from counsel after the final charge.

Assuming, *arguendo*, the issue is not waived, "[t]he trial court has broad discretion in phrasing its instructions, . . . so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Hawkins*, 787 A.2d 292, 301 (Pa. 2001). "The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." *Commonwealth v. Brown*, 911 A.2d 576, 583 (Pa. Super. 2006). "When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial." *Id.* Only where there is an abuse of discretion or an inaccurate statement of the law

22

is there reversible error in the giving of jury instructions. *Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014).

"When a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference that it would have been unfavorable." *Commonwealth v. Boyle*, 733 A.2d 633, 638 (Pa. Super. 1999). However, a party is not entitled to the missing witness instruction if the witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth, the witness is equally available to both parties, there is a satisfactory explanation as to why the party failed to call the witness, or the witness is not available or within the control of the party against whom the negative inference is desired. *Id.*

"To invoke the missing witness instruction against the Commonwealth, the witness must only be available to the Commonwealth and no other exceptions must apply." *Boyle*, 733 A.2d at 638-39. In *Boyle*, where the defendant knew the identity of the missing witness, he could have called the witness to testify, and the Commonwealth offered a satisfactory explanation for the non-production of the witness, the trial court did not err in denying the missing witness jury instruction. *Id.* at 639. In *Commonwealth v. Miller*, 172 A.3d 632 (Pa. Super. 2017), the trial court did not abuse its discretion in declining to give a missing witness adverse inference instruction where the assault victim refused to testify for the Commonwealth and the victim "was equally available to both the Commonwealth and [the defendant] at trial." *Id.* at 646.

Here, the Commonwealth established that Aponte was a drug supplier for Gbotoe, he was reluctant to cooperate with police, he stopped talking to Gbotoe because he did not like snitches,

23

and he stated he did not want to testify when served with a subpoena. Thus, the Commonwealth offered a satisfactory explanation as to why they did not call Aponte as a witness. Furthermore, Aponte was not within the control of the Commonwealth, but was equally available to both parties. Moreover, Aponte's testimony was cumulative to that of Gbotoe and Nesmith. Most importantly, Appellant knew who Aponte was and knew where he lived because the shooting occurred at Aponte's apartment. Yet Appellant made the conscious choice not to subpoena Aponte or attempt to secure his attendance for trial. Therefore, this claim must fail.

### CONCLUSION

The jury's verdict on counts 1, 5, 6, and 7 was not so contrary to the evidence as to shock one's sense of justice. The Commonwealth presented sufficient evidence to prove the elements of the crimes on counts 7 and 8. The sentence imposed was not an abuse of discretion. Further, the court properly declined to give a missing witness jury instruction. Therefore, the appeal should be denied.

BY THE COURT:

Date: ___June 26, 2020___ _____
DONALD R. TOTARO, JUDGE

cc:  Jennifer L. Ponessa, Esquire, Assistant District Attorney
     Daniel C. Dougherty, Esquire, Counsel for Appellant

24